# Case No. 11,339.

## POTTER v. SUFFOLK INS. CO.

### [2 Sumn. 197.] [1]

Circuit Court, D. Massachusetts.    May Term, 1835.

MARINE INSURANCE — ACCIDENTS — INHERENT WEAKNESS OF VESSEL—STRANDING—LOSS BY EBBING OF TIDE.

1. Quære—If underwriters are liable for a loss within the terms of the policy, occasioned by the negligent or improper conduct of the master or owners.

[Answered affirmatively in Copeland v. New England Mar. Ins. Co., 2 Metc. (Mass.) 450.]

2. The underwriters on the common policy of insurance, are liable for all accidents arising from any extraordinary circumstances, and not from the inherent weakness of the vessel.

[Cited in Swift v. Union Ins. Co., 122 Mass. 578.]

3. Where an accident occurs in the ordinary course of grounding a vessel in a harbor, and there is no proof of inherent weakness, the loss must be attributed to some extraordinary cause, as the striking on some hard substance, or malposition, or overlaying the dock, which would be a peril of the sea, for which the underwriters would be liable.

[Cited in Anthony v. Aetna Ins. Co., Case No. 486; Pennsylvania R. Co. v. Manheim Ins. Co., 56 Fed. 303.]

4. A ship, proved to have been stoutly built, and between two and three years old, and without any circumstance in the evidence to lead to the supposition that she was rotten, or had at any previous period met with any calamity, having on board a small cargo, in a harbor, and at a wharf, which were usually safe for vessels of her tonnage, after taking the ground, was discovered to leak so badly, that surveyors were called, who, after a careful survey, reported the nature of her damage, and that "it was sustained

---

[1] [Reported by Charles Sumner, Esq.]

by the said vessel lying badly on the ground." *Held*, that this loss cannot be attributed to any inherent weakness of the vessel, but to some extraordinary cause, and is within the perils of the sea, for which the underwriters are liable.

[Cited in Hagar v. New England Ins. Co., 59 Me. 463.]

5. The effect of the memorandum clause in policies is not to enlarge the perils underwritten against, but to exempt the underwriters from certain losses, within these perils.

[Cited in Dole v. Merchants' Mut. Mar. Ins. Co., 51 Me. 472.]

6. To constitute a stranding. within the policy, the vessel must be on the strand under extraordinary circumstances.

7. A loss by the ebbing of the tide is a loss by the perils of the sea, if it be not mere wear and tear, but extraordinary in its nature or mode.

This was the case of a policy of insurance dated on 30th of March, 1830, "for $9000 on the brig Benjamin Ruggles, at and from New York, commencing the risk at noon on the 27th of March, 1830, to, at and from, all ports and places to which she may proceed, for and during the term of one year from that time," with a provision for a continuation of the risk if she should be then at sea, &c. at a premium of 7 per cent. Vessel valued at $15,000. The policy contained the usual risks of Boston policies. The declaration contained several counts. (1) For $987.-53, a proportion of general average incurred; (2) for a total loss by perils of the seas; (3) count for money had and received. Plea, the general issue. The facts not in controversy in the cause were as follows: The brig being of 296 tons burthen, perfectly seaworthy at the commencement of the voyage, sailed from New York for Philadelphia and then for London, and arrived at London. She afterwards sailed from London for Newport, in Monmouthshire in England, and safely arrived there in the latter part of June, 1830. The purpose of going to Newport was to take in a cargo of iron for New York. On the 6th of July, the brig, having discharged a part of her ballast, hauled along side the iron wharf in Newport, and on the 9th of July commenced loading, and continued to discharge ballast and load iron until the 17th of the same month, and then had on board about 290 tons of iron, which was not an undue cargo for a vessel of the size of the brig, she being capable of carrying more than 400 tons of iron. The harbor of Newport is a dry harbor, the tide rising and falling about thirty feet; the bottom, at the wharf where the brig lay, consisted of soft mud of several feet thickness, resting on a stony bottom, commonly called "shingles." On the 18th of July, it was found, that the brig made a good deal of water, fourteen inches per hour. A surveyor was called, who directed the cargo to be unloaded, and the vessel put into a dry dock, in order to inspect her bottom. She was accordingly unloaded and put into a dry dock. The surveyors, in their survey, state, that upon "a strict and careful survey of the damage sustained by the said vessel,

lying badly on the ground at Tredegar wharf, Pillgwenlly" (the iron wharf), they found the butt ends of the sheathing started off, the false keel very much chafed, and the scarf of it hove out. On taking off some sheathing board in the way of the bilges, keel, and garboard, they discovered the butts to be very open, and the seams in general much strained, and in some places the oakum worked out. They afterwards, when the whole of the cargo was taken out, and the sheathing was taken off, and the bottom trimmed down clean, in pursuance of their recommendation, made a second survey, in which they state, that the butt ends and seams, fore and aft, were much strained; and several of the butts started, particularly in the bilges and bottom; several treenails bad, and butt bolts started in and out; three planks under the larboard bilge very much damaged, worm-eaten and split; the false keel much chafed, and the scarf started; the butts and seams of the water-ways, covering board and deck, strained and open. They recommended the false keel to be dubbed down, and fresh bolted; three planks under the bilge to be taken out, and replaced with three new ones (proper shifts), and· bad treenails bored out; the ship properly calked from keel to gunwale. water-ways and decks all round, and new wood sheathed. They further stated, that the lumber and rim boards were up, and none of the ground timbers were broken; but were all sound and good. The repairs were accordingly made. The brig took in a full cargo of iron, ·viz. about 450 tons, and safely arrived therewith·at New York.

The parties agreed, that the cause should be heard by the court, and a verdict for the plaintiff [Robinson Potter] taken subject to the opinion of the court, upon the whole evidence; and then the amount to be ascertained, if necessary, by an auditor, according to the principles decided by the court.

J. Mason, for plaintiff.   T. Parsons and S. Hubbard, for defendant.

STORY, Circuit Justice. The principal claim now in controversy is for the repairs made at Newport. And the question is, whether, under all the circumstances in the case, they are a loss within the perils in the policy; or rather, as the declaration is framed, whether it is a loss by the perils of the seas, for which the underwriters are responsible. The brig was built in Newport (Rhode Island), in 1827, of oak and spruce of the first quality, and quite strong and stout. And no evidence exists to show, that she had, during the present, or any former voyage, sustained any such injuries as would materially impair her structure or strength. She had. in a previous voyage, carried a cargo of 400 tons of rail-road iron from the neighboring port of Cardiff, in Wales, to Philadelphia, and the loading was under circumstances not materially different from these on the present occasion, so far

as the harbor and fall of the tide are concerned. That the loss on the present occasion arose from severe straining of the vessel cannot well be doubted. But the important inquiry is, as to the cause or manner, in which it was occasioned. Was it from the ordinary manner of the ship's taking the ground in such a harbor? It is hardly to be presumed, that such could be the fact; for under such circumstances, the harbor or wharf would not be a fit place for vessels of such a burthen under any circumstances; which is not pretended, and indeed, is refuted by the evidence. If the harbor or wharf was an improper one for such a ship, and the loss was occasioned by the negligent or improper conduct of the master, then, indeed, the underwriters would not be liable for the loss, unless in those cases, in which, upon the doctrine, "Causa proxima, non remota spectatur," underwriters are held responsible for losses. Perhaps it may be thought, that the doctrine maintained in Massachusetts, contrary to what has been maintained in England and in the supreme court of the United States (See Busk v. Royal Exchange Assur. Co., 2 Barn. & Ald. 73; Walker v. Maitland, 5 Barn. & Ald. 171; Bishop v. Pentland, 7 Barn. & C. 219; Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 222), is, that no recovery can be had for a loss of this sort, caused by the negligence of the owner or the master. I do not say, that it has been definitely so adjudged in Massachusetts; but such has been the course of opinion in the state. See Brazier v. Clap, 5 Mass. 1; Cleveland v. Union Ins. Co., 8 Mass. 321; Ellery v. New England Ins. Co., 8 Pick. 14, 22. But it is unnecessary to decide this point; because it cannot be doubted from the evidence, that in the ordinary course of taking the ground in this harbor, or at this wharf, the present loss would not have occurred. It must, then, have arisen either from the inherent weakness of the vessel, or from some extraordinary accident or casualty. There is no doubt, from the evidence, that such a loss might be occasioned by the vessel striking on some hard substance, or from the vessel overlaying her dock, or from some mal-position. Some of the witnesses assert, that accidents of the like sort have occurred in this very harbor from such overlaying the dock or mal-position. The captain of the brig, however, attributes this very loss to another circumstance, viz. the striking upon some hard substance. But, whether it was occasioned in the one way, or in the other, or in any other unknown manner, if it was not such a loss as would ordinarily occur in taking the ground at that wharf on the ebbing of the tide, and it was not in truth occasioned by the inherent weakness of the vessel itself, it is not material; for the underwriters are responsible for all accidents of this sort occasioned by the recess of the tide, where they arise from extraordinary and extraneous circumstances, and not from such inherent weakness. Striking on a hard substance

would be such an extraordinary accident. But it is only one instance, illustrative of the rule, and not itself of the essence of the rule. Any other accident, not in the usual course of grounding on the recess of the tide, but arising from some unexpected and unusual cause, would be equally within the rule. There is no doubt, that any injury, which must arise in the ordinary course of grounding at every tide in a tide harbor is not a loss within the policy; but it is treated as the ordinary wear and tear of the voyage. There must be some extraordinary injury, not arising from the ordinary course of the navigation to make the underwriters responsible.

It appears to me, that this view of the matter is fully borne out by the authorities. The case of Fletcher v. Inglis, 2 Barn. & Ald. 315, is directly in point. There, a transport in the government service, insured on time, was moored in the harbor of Boulogne, near one of the quays. The harbor of Boulogne is a dry harbor, with a hard uneven bottom, and upon the recess of the tide, the ship took the ground and struck hard, and received some injury in several of her knees, for which the suit was brought. The question was, whether the loss was a loss by the perils of the sea within the meaning of the policy. The argument was, that it was a mere taking of the ground under ordinary circumstances; and, therefore, the injury was but ordinary wear and tear; and that it did not arise from any extraordinary accident, which would be a peril of the sea. But the court were of opinion, that the loss was by the perils of the sea. Now, the sole ground of this determination must have been, that the loss was not such, as would naturally and commonly occur by the ordinary grounding; for then it would be mere wear and tear; but that it was unusual and extraordinary in character and degree. The case of Thompson v. Whitmore, 3 Taunt. 227, is clearly distinguishable. There, the loss was, while the vessel was hauled down on a beach to be cleaned and caulked; and, when the tide fell, some of the planks of the side, on which she lay, gave way, and some of her foot hooks were broken; and it was held, that, as the damage happened on land, it was not a loss by the perils of the sea; which was the only loss declared on. Rowcroft v. Dunmore, there cited, was decided on the same ground. In Phillips v. Barber, 5 Barn. & Ald. 161, the loss under like circumstances was held not to be by perils of the sea, but still that it was a loss within that policy.

The cases on the memorandum clause, in the common policies, so far from impugning, fortify the doctrine. They all proceed upon the definition of what constitutes a stranding in the sense of the policy,—so as to let in all losses by the ordinary perils, within the policy. Now, if the losses in those cases, supposing there were no memorandum clause, would not be within the policy, it would be wholly unnecessary to consider, whether

there was a stranding, or not; for the underwriters would not be liable, either way, for the loss. The memorandum clause does not operate as an enlargement of the perils underwritten against; but it operates to exempt the underwriters from certain losses within those perils. It seems to me, that those cases are founded in entire good sense. They decide this general principle, that where the vessel, in a tide harbor, takes the ground in the ordinary way upon the ebbing of the tide, it is not a stranding within the policy, although, in common language, the vessel is on the strand. But, to constitute "stranding," she must be on the strand under extraordinary circumstances, or from extraneous causes. I do not go over the cases. They are commented on with great ability and clearness in Wells v. Hopwood, 3 Barn. & Adol. 20, and Kingsford v. Marshall, 8 Bing. 458, which contain all the learning upon the subject. But in none of those cases was there any doubt, that the loss itself, except for the memorandum clause, would have been a loss within the policy. In Kingsford v. Marshall, Id. 462, Lord Chief Justice Tindal prefaced his able opinion by saying, "That the injury done to the ship or goods by settling on a hard substance at the bottom of the harbor (which was the case before the court) would be a damage recoverable on a policy on a ship, or a policy on goods, not included in the memorandum, as an injury occasioned by perils of the sea, is beyond all doubt." It thus affirms the principle, that the loss by the ebbing of the tide is a loss by the perils of the sea, if it be not mere wear and tear, but extraordinary in its nature or mode. If a ship should, in taking the ground, fall over, and thereby bilge (which would be no ordinary injury, but an unusual accident), it would be a loss by perils of the sea, just as much as it would be if done by striking on a hard substance. This seems also to have been the doctrine in Carruthers v. Sydebotham, 4 Maule & S. 77, as it certainly was in Wells v. Hopwood, 3 Barn. & Adol. 20, and Bishop v. Pentland, 7 Barn. & C. 219. The case of Fletcher v. Inglis, 2 Barn. & Ald. 315, did not turn upon any distinction, whether the injury was by a hard or by a soft substance; but upon the point, whether it was an ordinary injury, or an extraordinary accident. Unless, therefore, that case is to be overturned, and it has no where been questioned or denied, it governs the present, if the present injury was not from the inherent debility of the ship; for no person pretends, that it was the ordinary wear and tear in grounding in the harbor of Newport. The only case, which can, as I think, be deemed to lead in the opposite direction upon this point, is Hearne v. Edmunds, 1 Brod. & B. 388. That case, however, turned, not upon any question, as to the loss being a loss by the perils of the sea; but, whether it was a case of stranding. So it has been understood in all subsequent discussions on the same subject; and if otherwise understood, it would be irreconcilable with other decisions.

The present case is, therefore, after all, narrowed down to the consideration, whether the loss was from the inherent weakness of the vessel; for if it was not from such weakness, it was occasioned by an unusual and extraordinary accident in grounding, upon the ebbing of the tide, which would be a peril of the sea. Upon examining the testimony, it does not strike me, that there is any sufficient proof of such weakness. So far as the proof goes, it seems to me to be, if not altogether, at least by a great preponderance of weight, the other way. In the first place, the original build and age of the vessel will not justify any such conclusion. She is proved to have been strongly and stoutly built. She was only between two and three years old; and there is nothing in the whole evidence to lead to the slightest supposition that she was rotten, or had, at any previous period, met with any calamity, which could render her either infirm, or incapable of carrying such a cargo. On the contrary, in a prior voyage, she had taken on board a cargo of railroad iron of 400 tons at the neighboring port of Cardiff, where the tide ebbs and flows in the like manner, without the slightest complaint or injury. In the next place, she was not, at the time of this accident, heavily laden. She had on board only about 290 tons of iron, which no one now pretends was either a burthensome or overloaded cargo for her in such a harbor; and the wharf, where she lay, was a safe wharf for vessels of her tonnage. The principal foundation, upon which the argument of her inherent weakness rests, is, that she was so greatly strained and injured, that it could not have arisen from the ordinary wear and tear of grounding in her local position, or from her cargo, which was not a heavy cargo; and, therefore, it must have arisen from her inherent weakness. Now, there is this difficulty in the very structure of the argument, that it does not provide for certain other events, either of which was capable of producing the same effects, viz.: striking on a hard substance in grounding, or overlaying her dock, or accidentally taking the ground in a mal-position, or at an unsuitable point, so as to throw an unusual and extraordinary strain upon the parts of the vessel, which sustained so much injury. Besides; this supposed inherent weakness is not only not established by the antecedent history of the vessel in other voyages; but it is in apparent opposition to her subsequent history. In this very voyage, after the repairs were made upon her (which were not great) she took on board a cargo of 450 tons of iron, and brought it safely home; and in other voyages she has carried cargoes equally burthensome. It seems to me exceedingly difficult to maintain, that, under such circumstances, there is any just

ground to attribute the injury to any inherent incapacity of the vessel to bear such a cargo in the ordinary way, in such a harbor, at the ebb of the tide. It is no answer to say, that, in fact, she proved too weak to bear it. It is necessary to show, that such inability was the result of her intrinsic weakness, and not of any extraordinary or extraneous cause.

My opinion, upon a full survey of the evidence, is, that the loss is not attributable to any inherent weakness of the vessel, but is attributable to other extraneous and extraordinary causes, such as striking some hard substance, or mal-position, or bad taking of the ground, or overlaying the dock. If attributable to any such extraneous and extraordinary cause, taking effect by reason of the ebbing of the tide, it is in my judgment a loss by perils of the sea, for which the underwriters are responsible. The verdict for the plaintiff is, therefore, correct in principle; and the cause will be referred to an auditor, to ascertain the amount, to which the plaintiff is entitled.