Casey, Oh. J.,
delivered the opinion of the court:
The claim set up in this case is founded upon the services of several steamboats owned by the claimant, rendered to the- *128 United States, at tbe times and under the circumstances hereafter detailed.
I. The claimant alleges and proves that he was the owner of the side-wheel steamer J. H. Russell, and that this steamer in the latter part of August, 1863, arrived at St. Louis, Missouri, from New Orleans. She was about to take on a cargo of private freight at rates varying from two dollars to three dollars per hundred-weight, with horses and cattle on foot at from ■forty to fifty dollars per head. Her capacity was about five hundred tons; but before she received her cargo she was seized or impressed into the service of the United States by the military authorities at St. Louis, laden with government freight, and dispatched thence to New Orleans. The government freight was unloaded there, and she took on a cargo of private freight and returned to St. Louis. There she was again seized by the government, laden with military stores and supplies, and once more dispatched to New Orleans. There was a full complement of hands on board the boat at the time she was impressed into the service, and they were retained and paid by the claimant; and the other expenses of the boat were also •defrayed by him while she was performing this government ■service. The boat’s papers appear to have been destroyed with her when she was afterward burned, and the dates of her seizures and 'the exact time of her detention are not very clearly and distinctly made out by the testimony. The petition states she was seized about the 8th of September, and the evidence shows she arrived at New Orleans on her second trip about the 18th or 20th of November. Owing to being very heavily laden, and the low stage of water, and being compelled to carry her fuel with her in two barges, the trips were prolonged to fourteen days in one instance and eighteen in the other. On «one of the trips she was grounded, and the claimant was compelled to pay $2,700 to another boat for assistance in getting her afloat. The claim is made for eighty-one days’ service of this boat, at $750 per day; and also $2,700 paid to the boat David Tatum for assistance and lighterage, as well as $14,000 for damages to the boat while she was in the government service. And he allows a credit of $5,094 67 received from'the quartermaster on account of the services.
We find that this steamer was seized at St. Louis, on the 8th September, 1863, and continued in government service until *129 thé 25tb of the same month, a period of seventeen days; that she was again detained and impressed into the service of the United States on the 2d of October, and so continued until the 20th of November, 1863, a period of fifty days, making together sixty-seven days. During this time she was under steam, or engaged in making the two voyages from St. Louis to New Orleans — on the one trip fourteen, and the other trip eighteen days; or thirty two days in the whole, and detained at the wharves thirty-five days.
We find the expense of the boat as follows:
32 days running, at $400. $12,300 00
35 days at wharves, at $250. 8,750' 00
Paid for lighterage, and to boat D. Tatum. 2,700 00
Expenses for-67 days.■. 23,750 00
For pay of boat, at $150 per day. 10,050 00
33, 800 00
Deduct amount paid. 5, 094 67
28, 705 33
We find also that the steamer Liberty, owned by and belonging to the claimant, with her crew and equipments, was impressed into the government service by the following order:
“ Transportation Department,
“ St. Louis, Mo., September 2, 1864.
“ Captain of Steamer Liberty—
“ Sir : Imperative military necessity requires the services of your steamer for a brief period.
“ Your captain will report at this office at once in person, first stopping the receiving of freight, should the steamer be so doing.
“ Respectfully,
“ L. S. METCALF,
“ Captain and A. Q. M.”
Under this order she was loaded with military supplies and dispatched to Duvall’s Bluff, in Arkansas, and up White.River. She was so engaged for twenty-six days, and during which time the expenses of the boat were defrayed and her fuel found' by the claimant.
*130 Tbe expenses and services we find to be as follows :
26 days’ wages of crew, fuel, and general expense ' of boat, at $300 per day. $7,800 00
Compensation for boat, at $100 per day. 2, 600 00
10,400 00
Amount paid by quartermaster. 1,800 00
Balance due. 8,600 00
The same boat was afterward impressed by Colonel Hola-bird, quartermaster United States Army at New Orleans, and detained in government services from the 11th of February, 1865, until the 16th of July, 1865 — a period of 155 days. Dim-ing this time her fuel was furnished and her crew paid by the United States. During this time the claimant 'for the first seventy-eight days was paid at the rate of $150 per day; and for the remaining time at the rate of $85 per day; amounting in the whole to $18,245, or at the rate of about $117 50 per day for the whole time. And which, under all the facts, we consider a fair compensation for the boat, and refuse to allow anything further.
The claimant also claims for the hire of the boat Time and Tide, impressed into the service under the circumstances stated in the following certificate of Colonel Holabird, chief quartermaster at New Orleans:
“ Office Chief Quabtebmasteb,
“ Depabtmetít oe the Gulf,
“New Orleans, Lotdsiana, Jmie 30,1865.
“ I certify, to the best of my knowledge and belief, that I was in an official position to know the facts of the case in the claim of the Time and Tide, and that the Time and Tide, a stern-wheel steamer, owned by J. BE. Russell, was seized on or about the 21st of March, 1864; relinquished on the 31st of March, and again seized on the 8th of April, by command of Major General Banks, commanding Department of the Gulf, for conveying troops and public stores up Red River.
“ This boat was not in public service by charter or otherwise when seized, but was owned by a loyal citizen of the United States.
“ The boat was detained and kept in the service of the United States for sixty days, and was paid by the quartermaster at *131 tbe rate of $50 per day. Tbe claimant alleges ber services were worth to tbe United States from $150 to $175 per day, and be •claims to recover tbis difference, together with damages for injuries which tbe boat sustained while in government employ.”
We find that tbe services of tbe boat were worth $117 50 per day.
>60 days, at $117 50 .$7,050 00
Deduct amount paid. 3,000 00
Balance due. 4,050 00
recapitulation.
Amount due from steamers—
J. H. Russell.:.$28, 705 33
Liberty. 8,600 00
Time and Tide. 4,050 00
Amount due. 41,355 33
Tbe only defence set up by tbe Attorney General in tbis case, •on behalf of tbe United States, is tbe act of July 4th, 1864. It is insisted that it was an appropriation by the army of tbe property, within the meaning of tbe first section of tbe act, and therefore excluded from our jurisdiction. But we do not think tbe case falls within tbe letter or spirit of tbe act. That law was intended to embrace all those cases of direct and incidental destruction of, and damage to, property, which are inseparable from tbe operations of large land and naval forces carrying on active hostilities against an enemy, as well as tbe unlicensed predatory acts and pillage of tbe soldiery. Tbe act further excludes from our jurisdiction all authorized cases of seizure and appropriation of property by tbe army and navy engaged in tbe suppression of tbe rebellion. And where competent military or naval- authority has so seized and appropriated property, we have clearly no jmisdiction. Tbe right of tbe government, in times of peril or great public exigencies, to take and apply tbe property of any citizen to secure tbe safety or well-being of tbe government, is not disputed, but admitted to tbe full extent. But under'a just and free government like ours, such a procedure is only resorted to and can only be justified when tbe public necessities are pressing and tbe peril is *132 imminent. And even in all snob cases, tbe obligation of tbe government to make, and tbe citizen to receive, just compensation for tbe property so taken, is complete and perfect. Here tbe services of tbe claimant’s vessels, bis own, and those of tbe crews sailing them, were not seized with a view of appropriating tbe property to tbe United States, within tbe meaning of this act.
Such an appropriation is not to be inferred when tbe facts are capable of a different application and solution, because a just and paternal government never resorts to this extraordinary mode of supplying its wants, except in great exigencies- and when all tbe usual methods have failed, or would be inefficient or unavailing. And because this is so, an arbitrary seizure and appropriation of tbe property of tbe citizens by tbe government will not be presumed, when its acts may reasonably be accounted for by a different conclusion. In tbe casein band there does not appear to have been any intention to-appropriate these boats to tbe United States, or even their services j but to compel tbe captains and crews to perform certain duties and to pay them a reasonable compensation for such services.
This is evidenced by tbe fact that tbe government has from time to time paid to tbe claimant certain sums on account of those services, both while tbe boats were rendering it and since. It is shown further that when such services were no longer-required tbe boats were discharged and delivered up to tbe owner; a proceeding entirely inconsistent with an appropriation of them to tbe United States. (Bogart v. The United States, 2 C. Cls. R., 159 ; Mitchell v. Harmony, 13 How., 115.)
"We think there was no appropriation of this property or services, but such an employment of them in tbe service of the-United States as raises an implied promise to reimburse tbe claimant for tbe money expended for tbe United States, and a fair and reasonable compensation for bis own services and those of bis vessels. .
This compensation we have fixed at tbe lowest points tbe evidence would authorize in each case, according to tbe statements and calculations above set forth.
Among other reasons, we have done so because tbe insurance- and risk of that kind of property is one of tbe matters for which a large compensation is usually allowed But all such *133 property, by the act of Congress, while in the service of the United States, is at their risk. (Acts 3d March, 1849, 9 Stat. L., p. 414, and 3d March, 1863, 12 Stat. L., p. 743.) They are in effect the insurers, and where it perishes while in their employ, without the fault of the owner, they pay the value of :it, as of the time it was taken into the service. And on this .account we have reduced the per diem compensation of the ■boats lower than we would if they had been at the risk of the owner.
And from these facts and circumstances we find there is still due and owing from the United States to the claimant the sum of $41,355 33. And for this sum judgment is to be rendered in his favor.