Nott, J.,
delivered the opiuion of the court:
This is an action brought to recover $3,717 84, being a balance, as is alleged, dile to the claimant upon the charter-party of the schooner Haxall. The case comes before us on a special demurrer to the petition.
The act 4th July, 1864, (13 Stat. L., 381,) provides that the jurisdiction of this court “ shall not extend to or include any claim” “ growing out of the destruction or appropriation of, or damage to, property by the army or navy.” The petition of the claimant sets forth that the schooner. Haxall “was sunk by order of Major General Benjamin F. Butler, commanding the department of the James.” It is therefore evident that the case comes within the very letter of the prohibition, unless there are some additional facts alleged which confer jurisdiction upon the court.
These facts the claimant insists are set forth in the original charter-party of the vessel, which he annexes to and makes a part of his petition. This charter-party provides, first, that the “ war risk” shall be borne by the United States ; and, second, that the “ marine risk” shall be borne by the owners. “ And, further, if at any time during the continuance of this charter the United States shall elect to purchase the said vessel, then they shall have the right to take her at the appraised value at the date of the charter” The claimant avoids saying whether he relies upon the assurance of the “ war risk” or upon the reserved right of the government to purchase. He simply alleges that his vessel, while in the military service of the United States, was sunk in the James river by order of the general commanding the department, “ and that there is due to him upon the said contract in the said charter-party the sum of $3,717 84;” thereby leaving it to the court to determine whether the contract referred to is the obligation on the part of the government to assume the “ war risk” of the vessel, or the right reserved by the government “ to take her at the appraised value.” And upon this point the brief of the counsel *163 is as barren as the pleading of the claimant; for it neither cites authorities to show that the term “ war risk” can be extended so as to embrace other than the acts of the. enemy, nor attempts to demonstrate that the sinking of the vessel in the James river was the exercise of the right “ to take her” at the stipulated price. Strictly and properly, and according to the ordinary .principles of pleading, the claim-mant should be required to allege this specifically. But here, inasmuch as such allegations, though in form averments of fact, would be in substance mere conclusions of law, the real and only fact being the seizure and sinking of the vessel, we think that the defects of the petition are not fatal, and that the court may proceed to give a legal effect to this act of the government, and determine whether it falls under either provision of the charter-party, or is to be deemed a destruction of property by the army'within the meaning of the act of 4th July, 1864, (13 Stat. L„ 381.)
The counsel for the claimant assumed on the argument that this is an action on a valued policy of insurance, and that the sinking of the vessel by a military officer of the government was covered by the term “ war risk.” Policies of insurance are ordinarily drawn after long-established forms, (Arnauld,) and the losses insured against are ordinarily pointed out by specific designations, such as the perils “ of the seas,” “ of enemies, pirates, rovers, and thieves,” “ of detainment of kings,” &c., &c. I do not find that this general term “war risk ” has ever been employed in a policy of insurance, or, if so employed, that it has ever received a judicial interpretation. As employed in this contract, we think that it cannot be extended so as to mean more than “ acts of the public enemyor, at the utmost, the casualties of war; and we think that it was never intended that the government should be placed on the same footing with the public enemy, or become an insurer against its own acts. '
But it is immaterial, so far as this question of jurisdiction is concerned, whether the government is liable under the insurance clause of the contract, or under the provision allowing it to take the vessel by purchase, so long as its liability grows out of the express contract. When this agreement was executed it was known to the parties that the vessel was to be employed in a service that was extra-hazardous. Accordingly, the contract provided for three contingencies by which the owner was liable to lose his vessel: 1st. There was the ordinary or “ marine risk,” and it was to be borne by the owner. 2d. There was the extraordinary or “ war risk,” and it was to be borne by the government. 3d. There was the right of the government to take the *164 vessel; and with respect to it tbe claimant was secured by an express appraisement.
Against this last provision it may be said that the officer who seized the vessel did not proceed under or by virtue of the contract, and that the government, therefore, did not take the vessel by the exercise of its right of purchase as given by the agreement, but by the exercise of its right of eminent domain. Whatever may have been the individual intent of the officer making the seizure, and whether he knew or was ignorant of the fact that such a contract existed, is, I think, wholly immaterial. The claimant had placed his vessel in the military service of the country upon the faith of this contract, and the taking of the vessel (regarded as an act of the government) while in the military service of the country we think furnishes conclusive evidence that the government did elect to purchase.
“ The right which belongs to society or to the sovereign, of disposing, in case of necessity and for the public safety, of all the wealth contained in. the state, is called the eminent domain. It is evident that this right is in certain cases necessary to him who governs, and is consequently a part of the empire or sovereign power.” (Per Justice McKinley, Ballard vs. Hogan, 3 How. U. S. R., 223.) “ All the property in a state is derived from, or protected by, its government, and hence it is held subject to its wants in taxation and to certain important public uses both in war and peace. (Vattel, § 244 ; 2 Kent, 270; 37 Am. Jur., 121; 1 Blks., 139; 3 Wils., 303; 3 Story Const., 661; 3 Dal., 95.) Some ground this public right on sovereignty, (2 Kent, 339; Grotius, B. 1, ch. 1, § 6;) some on necessity, (2 John., ch. 162; 11 Wend., 51; 14 Wend., 51; 1 Rice, 383; 2 Dal., 310; 2 Porter, 303; 3 Yerger, 53;) some on implied compact, (2 Dev. and Bat., 456; 2 Bay., 36, in S. Car.; 3 Yerger, 53.”) (Per Justice Wood-bury, The West River Bridge Co. vs. Dix, 6 How. U. S. R., 539.)
But whether grounded on sovereignty, necessity, or implied compact, this right of eminent domain is the last means for acquiring property to be exercised by a government or to be resorted to by a court. It is, indeed, a right exercised by all governments and inherent in all sovereignties. But it is a remedy harsh in its nature, rarely just, liable to gross perversion, and one which in practice, as in theory, encroaches for the welfare of the mass upon the rights of the individual. In our own country, as in England, it has been always the object of public suspicion and distrust. The unrestricted right to resort to it given by the Constitution constituted a leading objection to the adoption of that instrument; and so strongly was the *165 objection grounded in tbe public mind, that a restraining safeguard was deemed necessary as one of the first of our constitutional amendments. The policy of the government also has always been against its free exercise, and to acquire by purchase, where that was possible, rather than by resorting to this power. In the case at bar the government had the right to take the vessel by virtue of its sovereign authority; but it also had “the right to take her” by virtue of the express words of the contract. This “ right to take her ” the government exercised while she continued in.its military service, complying with the terms of the agreement that brought her there. The government had contracted for her purchase, and could, obtain possession of her at any moment by the terms of that agreement. There was, therefore, no “ necessity” for a resort to the right of eminent domain, and without a necessity such a resort would have been unjust, oppressive, and illegal. We perceive no reason why the government should pass by “ the right to take her” which had been secured by purchase, and “ unnecessarily” resort to the exercise of a power that “necessity” alone could justify. When the court can impute to the government a fair compliance with the terms of its agreements or an unnecessary exercise of its power, it is not a question which construction of its acts shall be adopted.
It is also thought by some of us that when a party voluntarily places his vessel in the military service of the country, and she is taken or destroyed by the government, the acts of Congress providing compensation for such property constitute and create an implied contract, and in legal effect, as in fact, form a part of the consideration which induces parties to place their vessels in the possession of the government. An implied contract, however, always yields to an express one, and the parties here having provided for the taking of the vessel, and having agreed upon the price to be paid if so purchased, need not go behind the terms of their agreement. Our conclusion, therefore, is, that the government must be deemed to have exercised its right to purchase the vessel; and that this action being in fact founded upon contract, the court thereby possesses jurisdiction.
But apart from this question of jurisdiction, the demurrer presents another objection, which indeed was the point chiefly argued by the counsel and relied upon by the defendants.
The act of 3d March, 1849, (9 Stat. L., 414,) as extended by the act of 3d March, 1863, (12 Stat. L., 743,) provides for compensating the owners of “ steamboats and other vessels” lost or destroyed while “ in the military service of the United States.” These claims are to *166 be “ adjusted by the Third Auditor, under such rules as shall be prescribed [not by the Secretary of the Treasury, but] by the Secretary of War.” The act alludes to “the species and degrees of evidence,” and “ the manner in which such evidence shall be taken and authenticated.” The “ adjudications” of the Auditor are to be entered in a book to bo provided for that purpose, and the statute not only terms these adjudications “judgments,” but directs that they shall be entered whether “ in favor of or adverse to the claim.”
Now, the petition in this case shows that the claimant “ made his application to the Third Auditor for payment of his loss aforesaid, upon which application such proceedings were had that on the 10th of January, in the year 1865, an award was made” in favor of the claimant for $10,000, which sum of $10,000 the claimant received. Upon this averment the defendants founded a special demurrer, and the Deputy Solicitor who appeared for'the government argues that the Third Auditor did not sit upon this claim iu his character of Auditor, but rather as a commissioner or arbitrator, and that an award founded upon evidence, termed by the statute a judgment, and accepted by the claimant, constitutes an estoppel, and is binding and conclusive upon the parties.
The only provision of the act of 1849 which could apply to the claim before the Auditor is contained in the clause of the second section, viz: “ destruction by the order of the commanding general.” We are of the opinion that the point made and argued is not now before the court, and that it is in effect determined by the point already decided ; for if the claim rests upon the destruction of the vessel by the army, then the court has no jurisdiction of the case ; and if the claim was presented to the Third Auditor as one founded upon an express contract, then his award could not have been based upon the statutory ground of “destruction by the order of the commanding general,” and he must have sat as an ordinary accounting officer. Now, the petition does not aver that the claim was presented to the Auditor upon this statutory ground, though it is true that it does not show that the claim was passed upon as one arising exclusively from an express contract. Ordinarily, a pleading is to be construed most strongly against the pleader. But estoppels are said “ to be odious, and not to be favored in law,” and courts never aid estoppels by in-tendment, nor supply by construction the facts out of which they arise.
Whether the proceedings before the Third Auditor, followed by the claimant’s acceptance of the award, were final and conclusive upon *167 him; and whether, by preferring his claim to the Third Auditor upon the statutory ground of the vessel having been destroyed “by the order of the commanding general,” he may he held to have abandoned his contract and to have elected to pursue a remedy inconsistent with his right to again resort to the contract, are questions upon which we express no opinion. It may be a question whether the claimant ought not to have applied for a settlement of his contract to the War Department instead of to the Third Auditor, but that objection is not taken by the demurrer and cannot he considered now.
The judgment of the court is, that the demurrer be overruled, with leave to the defendants to answer.