Casey, Ch. J.,
opinion:
The damage to this vessel was caused by a marine disaster. It happened by a peril of the sea. And the question is whether the loss happening in this wray is to be borne by the United States, the hirers of the vessel, or by the claimant, the owner. This must be determined by the contract between the parties and by the nature,'character, and extent of the risks and responsibilities assumed by each. (The charter-party is here referred to and made part of the statement of facts in the case.) By this charter-party the owner agreed to keep the vessel tight, staunch, and strong, and manned, victualed, and appareled fit for merchant service at their own cost and charges; and were to receive on board, when tendered alongside the vessel, such troops, men, animals, and supplies or cargo as-a quartermaster should direct and the vessel conveniently could carry, and proceed direct to such ports and places as-ordered by the quartermaster of the United States Army, and deliver cargo to the quartermaster or proper agent. Pilot-age and port charges to be paid by the United States. All cargo to be received and delivered within reach of the vessel’s tackles. The vessel to deliver cargo in good order and condition, (the danger of the seas, fire, and navigation, and the restraints of princes and rulers being always excepted.) “ The war rislc to be borne by the United States, the marine rislc to b$ borne by the oivners.”
The compensation of the vessel was to be $182 25 per day, for every day the vessel should be employed. The United States to furnish fuel for the vessel until returned to Philadelphia. The vessel to be returned at the place named u in the same order as when received, ordinary wear and tear, damage by the elements, collision at sea and in port, bursting of boilers, and breakage of machinery excepted.”
In July, 1865, the vessel ivas at Brazos, St. lago, Texas, and *188 having been loaded with troops and stores by the quartermaster, was ordered to New Orleans, Louisiana. The bar at the mouth of the bay leading’ to that harbor is a difficult and dang'erous one to cross. At the time of receiving orders the water upon the bar was low and the wind high; but with a pilot furnished by the United States, and in tow of a United States tug, she proceeded to the bar. On the first attempt she failed to cross it. The vessel struck, the hawser of the tow parted, and .the vessel swung round inside the bar and returned to the landing. She sustained some injuries, Avhich could, if time had been given, have been repaired in a couple of days, at a cost of f 500 or $600; but, against the opinion and judgment of the captain of the vessel and the pilots, she was ordered by the quartermaster to proceed at once to sea. In attempting the second time to cross the bar she struck heavily several times. She ■succeeded in. getting over the bar, but in such an injured and leaking condition as to be compelled to anchor just outside the bar, and put her steam pumps at work to keep her from sinking. The condition of things was reported to the quartermaster, who sent another vessel alongside of her, took off the men and stores, and took her in tow to New Orleans. Here she was put on the ways and such temporary repairs as would enable her to make a couple of trips was made in twenty days. After-., ward she was again hauled up and the repairs completed. The time lost in making these repairs both times was forty-five and a half days.
The claim made was as follows:
First repairs.. $1,863 99
Twenty days’ time while repairs were being made.. 3,644 00
Second repairs. 5,026 81
'Twenty-five and a half days’ time. 4,647 27
Error in account...■. 215 40 .
15,397 47
This claim being submitted to the accounting- department, the Auditor and Comptroller disposed of it as follows:
One-half expense of first repairs, equitably apportioned to the United States. $931 99
Whole expense of second repairs, less one-third off, “new for old”. 3,351 21
*189 For running expenses while laid up for repairs; that is, the wages of master and men, and cost of provisioning the vessel. (Keply, p. 33). $2,281 06
Total allowed and paid. 6,564 26
DisalloAved. 8,833 21
15,397 47
It is for this balance of $8,833 21 that this suit is brought and prosecuted.
The United Statés contend that the loss ensued from a marine risk and not from a war risk. In other words, that the damage resulted to the vessel from a peril usually covered by a marine-insurance, from which the Avar risk is excluded. To recover,, the claimant must maintain one of three propositions.
1. That the damage resulted from a Avar risk; or,
2. That the rightful and kvwful acts of the agents and officers of the United States Avere such as to haAre discharged the under-AA'riters on a marine policy from liability for the loss, and'cast it upon the United States; or,
3. That the United States are liable for the negligent, rash,, and wrongful acts-of their subordinate officers.
1st. We are to inquire whether the damage to this vessel was-the result of a “ war risk ” assumed in the charter-party by the United States. The term “ Avar risk” is an unusual one. I do* not find it in the works on in surance or adjudged cases. In the case of Bogert v. The United States, (2 C. Cls. R., 159,) this court held that the terms in a policy in which the United States were the insurers could not be extended beyond “ the acts of the public enemy” or “ the casualties of war; ” and that by its use-the United States did not insure against their oavu acts. In that case the vessel was in the service under a valued charter-party, and containing the accruing clauses, with the right to purchase at the specified valuation. During the period of the vessel’s service, to guard against the approach, or defeat the operations of the enemy, General Butler caused the vessel to be sunk in the James Biver, and it Avas held that this was not embraced within the meaning of a Avar risk, as used in the charter-party; that such an undertaking by the government is not an insurance against its- own acts, although it destroyed *190 tbe vessel for a war purpose. To bring it within such a war risk as is assumed iu this contract, the damage must have resulted directly, or proximately at least, from some act or operations of the public enemy. Nothing of the kind exists here, and no obligation rests upon the United States growing out of that clause in the charter-party.
2d. We are next to inquire whether the circumstances proved here would relieve or discharge the underwriters in an ordinary marine policy for the loss ■, and it is not disputed seriously that the damage to this vessel resulted directly and proximately from a peril of the sea covered by such a policy. For whether there ivas such a policy or not can make no difference. The marine risk was to be borne by the owner, and if he failed to insure he became his own underwriter in the case. And it all comes back to that question whether the damage was the result of a marine risk.
I do not think that the decision turns to any extent upon the point so much discussed in the case, as to whether the ship for the time being belonged to the owner or the United States. The cases of Trinity Hause v. Clark, (4 M. & S., 288,) and New Berry v. Colvin, (7 Bingh., 190,) affirmed in the House of Lords, (1 Clark & Fin., 1283,) appear to establish the principle that the United States were pro lute vice the owners of the vessel ¡ yet I cannot see that this at all changes the aspect of the question, or varies the liability meant to be assumed by the respective parties by the terms of the charter-party. That it was a mere temporary ownership, which left a resulting and undoubtedly an insurable interest in the claimant, is quite plain and clear. But we shall arrive at the matter in a more direct manner if we suppose that the United States had assumed the entire risk, marine as well as war, and then taken out a marine policy on the vessel. Would, in such case, the acts of the quartermaster, here set up as the ground of claim, have discharged the underwriters6! It may be admitted that there was want of due caution on the part of the agent of the United States; that it was imprudent and negligent on his part to order the vessel to cross the bar at the particular time. Yet .the direct and immediate cause of the loss was the standing of the vessel on the bar, and not the order of the agent. And the maxim is, causa próxima non remota spectatur. In looking for this proximate cause, it is found to be a *191 peril of tlie sea. The remote cause may have beeu the rashness or negligence of the agent or servant of the owner. This rule is illustrated and applied in the case of Insurance Company v. Sherwood, (14 How., 351.) The brig Emily was insured against the usual sea perils. During a voyage and near the entrance of New York Harbor the Emily, through the negligence of her crew, collided with the schooner Yirginian. The E mily herself suffered considerable damage, and inflicted still more upon the Virginian. She was libeled at the instance of the latter and compelled to pay for the injury. These damages which she was compelled to pay to the Virginian, as well as those suffered by herself, the owners of the Emily sought to recover from the underwriters. It was held that the injuries occasioned to the Emily itself by this collision were occasioned by a peril of the sea, while those to the Virginian were the direct or proximate effect of the negligence of the servants and crew of the assured. The Virginian, if she had been insured, could, under the same doctrines, have recovered from the underwriters, or from the Emily, at her option.
In the case of Waters v. The Merchants’ Louisville Insurance Company, (11 Peters, 213,) the Supreme Court of the United States there review'the whole law upon the subject, and the principle established is, that “ a loss whose proximate cause was a peril insured against is within the policy, although remotely caused by the negligence of the master and crew.” In that case, the fire Avliich was the cause of the explosion, and by which the vessel' was totally destroyed, was alleged in the plea to have been caused by the negligence and unskillfulness of the master and crew, and it was held to be insufficient to discharge the underwriters. The same was held in The Columbia Insurance Company v. Lawrence, (10 Pet., 507.) This same doctrine is firmly established in England, by the cases of Bishop v. Pentland, (7 B. & C., 219,) Haldworth v. Wise, (7 ibid., 794,) citing Shore v. Bentall, by Lord Tenterdon, (in ante, p, 789.) Bask v. The Royal Insurance Company, (2 B. & Ald., 82.)
In Cullen v. Butler (5 M. & S., 461, Phil. Ins., § 1052) it was held that the liability of the owner of a vessel for the loss of the cargo by the fault of his master and crew does not necessarily exonerate the underwriters. Both may be liable at the same-time. The negligence of the master and crew may make the owner liable. The loss by a peril insured against fixes that of *192 the underwriter. And it is an established rule that “ if the damage can be accounted for by the perils of the sea, it will be. presumed to have so happened, unless it is proved to have been caused by culpable misconduct. Potter v. Suff. Insurance: Company, (2 Sumn., 197.) (Phillips on Ins., § 1053.) Hale v. Washington Insurance Company, (2 Sto., 176.) Where the vessel was insured against fire it was held that the owners were entitled to recover, where the master and crew set her on fire to prevent her falling into the hands of the enemy. Gordon v. Rimmington, (1 Camp., 123, see note.) (Phillips on Ins., § 1095.) In Radman v. Wilson (14 Mees. & W., 476) the loss occurred from stranding through the carelessness and unskillfulness of the crew, but this did not defeat a recovery on the policy. The Court of Exchequer Chamber in this case reaffirm the doctrines of Walker v. Maitland (5 B. .& Ald., 171) and Bishop v. Pentland, (7 B. & C., 219.)
A case that in some respects resembles the present one is found in Caruthers v. Sydebotham, (4 M & S., 77.) There, the loss occurred from the negligence and mistake of a duly commissioned public pilot. But it was held this did not affect the question. The vessel having perished from the immediate-operation of a peril insured against, the owner was entitled to. recover from the underwriters. (Phillips Ins., § 1058.) Now it appears to me that if this vessel had belonged absolutely to the United States, and had been insured by them, and she had been injured from the causes and in the manner detailed in this record, the underwriters would be liable under a policy against .the perils of the sea. The mistake or carelessness of the quartermaster in ordering the vessel to proceed at an improper time ought not to have any other or greater effect than the negligence or carelessness of the pilot or master would have in crossing the same bar at a proper time, but in such a careless, unskillful, and negligent way as to cause the damage to or loss of the vessel. The one has the same effect as the other, neither more nor less. The same result happens in each case. And the remote cause of the result in both cases is the improper,, mistaken, or negligent conduct of the servant or agent of the owner.
I have here treated the matter as if the servant or agent of this owner had been the person who was guilty of the negligence that remotely caused the damage. Even in that case I? *193 have shown, I think, from the well-considered judgments of the highest courts in England, adopted and recognized in all their length and breadth by the Supreme Court of the United States, that an ordinary marine policy would cover the loss in this case; that the alleged imprudent, careless, or reckless order of the quartermaster would not defeat a recovery thereon. If this be so, the actual case here presented is much stronger than that. Here the fault or negligence, or whatever else you may term it, was not that of the owner, his agent or servant; nor was it that of any other person for whose conduct he was responsible, no more than he was responsible for the negligent or reckless conduct of the master or crew of another vessel by which his own should have been injured; It is very plain, therefore, that the proximate cause of the damage to the claimant’s vessel was a peril covered by an ordinary marine policy. And this being so, he must look to that source, if he has such a policy, for his indemnity, or, if he neglected to take it out, he must bear the loss himself; for I can find nothing in these facts that would have precluded him from recovering on such .a policy, or that would have discharged or in any wise relieved the underwriters.
Thus we have seen that the damage to this vessel was not occasioned by a war risk. It was purely a mariné disaster. There was no such conduct on the part of the quartermaster as would change its character or preclude a recovery on a policy against loss. What grounds then remain to the claimant upon which he can base a recovery against the United States in this case 9 None, other than the reckless or negligent conduct of the defendant’s quartermaster at Brazos St. lago. There is nothing in. this charter-party besides, upon which a recovery could be predicated. The United States do not in any case guarantee the competency, skill, or care of their officers or agents. In their contracts and dealings with individuals none such is implied. I doubt much whether any officer, as the law now stands, could, even by express stipulation, impose such a liability on the United States as is here set up. Such an engagement would be against public policy and void. It would require an express enactment of Congress to authorize any one to assume such an obligation on behalf of this government. It is to all intents and purposes an action on the case for a marine *194 tort, or for negligence of defendant’s servants; and, whether one or the other, two fatal objections lie against its maintenance : first, we have no jurisdiction of such causes of action$ and, secondly, if we had, the United States are not liable on them.
This case cannot be distinguished in principle from that of Reybold v. The United States, decided at the present term. There the vessel, serving under a similar charter-party, was ordered by the quartermaster to proceed down the Potomac Báver while it was full of floating ice, and she was lost in the attempt to make the voyage. And it was held by a majority of the court that she perished from a marine risk incident to and growing out of the service in which she was engaged and for which she was chartered j that the marine risk was especially assumed by the owner in reference to the particular military service the boat was held to perform and the military orders to which she was by the contract expressly made subject; that these were the terms and conditions of her service, and for which she was paid. There is nothing in the facts of this case which varies the application of the principle or shakes its soundness, as stated and applied in the opinion of Judge Loring, in the case referred to.
That principle, applied here, is conclusive against the claimant’s right of recovery; and therefore judgment is to be entered for the defendants, and that the petition be dismissed.