## STANDARD OIL COMPANY OF NEW JERSEY v. UNITED STATES.

Nos. 27 and 28. Argued October 13, 1950.—Decided November 27, 1950.

*Edwin S. Murphy* argued the cause for petitioner. With him on the brief was *Ira A. Campbell.*

*Samuel D. Slade* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Assistant Attorney General Morison.*

MR. JUSTICE BLACK delivered the opinion of the Court.

These are admiralty proceedings involving the Government's liability on a policy of war risk insurance by which it insured petitioner's steam tanker *John Worthington* against "all consequences of hostilities or warlike operations." [1] Stipulated facts show that on December 16, 1942, there was a collision between the *Worthington* and the *YMS–12,* one of three United States Navy mine sweepers clearing the channel approaches to New York harbor.[2] Both vessels were at fault in failing "to comply

---

[1] The quoted language comes from the "F. C. & S. Clause" ("Free from Capture and Seizure") and is incorporated by reference in the war risk policy. War risk insurance is written in the following manner: the marine policy, which covers common perils of the sea, generally contains an "F. C. & S. Clause" eliminating from coverage certain named war risks, one of which is "all consequences of hostilities or warlike operations." The excepted risks are insured against either by adding a rider to the original marine policy, or by buying coverage from another underwriter—here the Government—who insures the perils excluded by the "F. C. & S. Clause." The opinions below set out more fully the documents on which the present insurance obligation rested. For a history of the development of the "F. C. & S. Clause" which originated in England, see 18 Halsbury's Laws of England (2d ed. 1935) § 439; *Ionides* v. *Universal Marine Ins. Co.,* 14 C. B. (N. S.) 259, 273 (1863).

[2] Counsel described the operation this way: "A mine sweeping operation . . . is a formation of vessels, each of which streams out behind it a device on a long cable which, towed along a certain distance under the water, is designed to cut the cable of any mine and bring it to the surface, where it can be destroyed by gunfire and the like."

with the applicable rules" of good seamanship "under the circumstances."

In the District Court the United States conceded that mine sweeping is a "warlike operation" but urged that the evidence failed to show that the collision was a "consequence" of the mine sweeping within the meaning of the insurance contract. Petitioner contended that the mere showing of loss from collision with the moving warship established liability under the policy as a matter of law. It argued that this was the English rule which should be followed by American courts. The District Court did not accept petitioner's view of the English rule. It read both the American and English authorities as conditioning the underwriter's liability on proof of facts showing that the "warlike operation" was the "proximate," "predominant and determining" cause of the loss. The court held for petitioner, finding as a fact that this burden of proof had been met. 81 F. Supp. 183. The Court of Appeals reversed. 178 F. 2d 488. It recognized that some language in certain English opinions possibly indicated that the facts relied on would make the war underwriter liable as a matter of law. Nevertheless, it refused to go that far and, contrary to the District Court, found as a fact that petitioner's evidence failed to show that the warlike phase of the mine sweeper's operation had caused the collision.[3] Petitioner sought certiorari here without

---

[3] We do not read the Court of Appeals decision as meaning that when negligence is present, the resulting loss can never be a war risk. The District Court held (and the Court of Appeals approved) that " ' "Proximate" here means, not latest in time, but predominant in efficiency.' '[T]here is necessarily involved a process of selection from among the co-operating causes to find what is the proximate cause in the particular case.' It is true that the causes of an event are all the preceding circumstances which brought the event to pass—and they are myriad." 81 F. Supp. 190. If the "warlike operation" was the "proximate cause" of the collision, then the fact

relying on the divergence below in the findings of fact on the question of causation. Its. ground was that the Court of Appeals had failed to hold for petitioner as a matter of law as the English cases allegedly required. We granted the writ, 339 U. S. 977, because of asserted conflict on this one point with *General Ins. Co.* v. *Link,* 173 F. 2d 955.

We are asked only to determine whether as a matter of law the provision insuring against "all consequences of . . . warlike operations" covered the loss resulting from collision between the *Worthington* and the mine sweeper. Of course, the intention of the contracting parties would control this decision, but as is so often the case, that intention is not readily ascertainable. Losses from collisions are prima facie perils of the sea covered by standard marine risk policies.[4] To take such a loss out of the marine policy and to bring it within the coverage of the provision insuring against "all consequences of" warlike operations, common sense dictates that there must be some causal relationship between the warlike operation and the collision. Courts have long so held in interpreting what was meant by use of the phrase "all consequences" in war risk policies.[5] In turn, the existence or non-existence of causal connection between the peril insured against and the loss has been determined by looking to the factual situation in each case and applying the

---

that the "warlike operation" was negligently conducted does not relieve the war risk underwriter of liability. Cf. *General Mut. Ins. Co.* v. *Sherwood,* 14 How. 351; 1 Phillips on Insurance (5th ed. 1867) ¶ 1049.

[4] Cases collected, 1912 D Ann. Cases 1038, 1040; 2 Arnould, Marine Insurance and Average (13th ed., Lord Chorley, 1950), § 827a.

[5] *Ionides* v. *Universal Marine Ins. Co.,* 14 C. B. (N. S.) 259 (1863); see *Queen Ins. Co.* v. *Globe & Rutgers Fire Ins. Co.,* 263 U. S. 487, 491. 2 Arnould, Marine Insurance and Average (13th ed., Lord Chorley, 1950), § 790.

concept of "proximate cause." [6]   Proximate cause in the insurance field has been variously defined.   It has been said that proximate cause referred to the "cause nearest to the loss." [7]   Again, courts have properly stated that proximate cause "does not necessarily refer to the cause nearest in point of time to the loss.   But the true meaning of that maxim is, that it refers to that cause which is most nearly and essentially connected with the loss as its efficient cause." [8]

In view of the foregoing, can it be said that the Court of Appeals erred in failing to hold as a matter of law that the mine sweeping, a warlike operation, was the "predominant and determining" cause of the collision?   As we read the record, the facts are susceptible both of the inference that the mine-sweeping activity of the *YMS-12* had some relation to the collision and that it did not.   That is to say, reasonable triers of fact considering all of the circumstances of this collision might differ as to whether the loss was predominantly or proximately caused by usual navigational hazards (and therefore an ordinary marine insurance risk) or whether it was caused by extraordinary perils stemming from the mine sweeping (and therefore a war insurance risk). [9]   Indeed, the District Court and the Court of Appeals did differ on this factual determination.

---

[6] *Insurance Co.* v. *Boon,* 95 U. S. 117; 3 Kent's Commentaries (14th ed., Gould, 1896) 302; cases are collected in 6 Couch, Cyclopedia of Insurance Law, § 1463.

[7] *Queen Ins. Co.* v. *Globe & Rutgers Fire Ins. Co.,* 263 U. S. 487, 492.   Cf. *Insurance Co.* v. *Transportation Co.,* 12 Wall. 194, 197–199.

[8] *Dole* v. *New England Mut. Ins. Co.,* 7 Fed. Cas. 837, 853 (C. C. Mass. 1864) decided by Mr. Justice Clifford on circuit.   Accord: *Insurance Co.* v. *Boon,* 95 U. S. 117; *Lanasa Fruit S. S. & Importing Co.* v. *Universal Ins. Co.,* 302 U. S. 556, 561–565; 3 Kent's Commentaries (14th ed., Gould, 1896) 302, n. 1; 1 Phillips on Insurance (5th ed. 1867) ¶ 1132.

[9] Ordinary marine insurance covers losses due to fortuitous perils of the sea.   War risk insurance covers losses due to perils superimposed on usual marine perils by war.   As Lord Wrenbury put it,

Since certiorari was not granted to consider that divergence in the findings of fact, we need go no further than to hold that the courts below properly considered the case as depending on the resolution of factual questions.

Petitioner nevertheless contends that (1) we are bound by certain decisions in the House of Lords and (2) these opinions have announced a rule-of-thumb construction of the phrase "all consequences of . . . warlike operations" under which the facts in this case result in war risk liability as a matter of law. We cannot accept these arguments. It is true that we and other American courts have emphasized the desirability of uniformity in decisions here and in England in interpretation and enforcement of marine insurance contracts.[10] Especially is uniformity desirable where, as here, the particular form of words employed originated in England. But this does not mean that American courts must follow House of Lords' decisions automatically. Actually our practice is no more than to accord respect to established doctrines of English maritime law.[11]

The difficulties inherent in the rigid conformity rule urged by petitioner are obvious to those familiar with the search for state decisional law under the *Erie-Tompkins* doctrine. In this very case, we, like the Court of Appeals, cannot be sure what conclusion the House of Lords would

"The question is whether the loss was occasioned by a new risk arising by reason of warlike operations." *Attorney-General* v. *Ard Coasters, Ltd.*, [1921] 2 A. C. 141, 154.

[10] *Queen Ins. Co.* v. *Globe & Rutgers Fire Ins. Co.*, 263 U. S. 487, 493. See *New York & Oriental S. S. Co.* v. *Automobile Ins. Co.*, 37 F. 2d 461, 463. The desire for uniformity in interpretation of the war risk clause may now be more academic than real. Since 1942, policies issued in England and in the United States have not contained similar provisions in this regard so that uniformity is no longer possible. Compare 1945 Am. Mar. Cas. 1035 with 1945 Am. Mar. Cas. 1036.

[11] *Aetna Ins. Co.* v. *United Fruit Co.*, 304 U. S. 430, 438.

reach were this case presented to it. Some of their decisions indicate that they would·have held as a matter of law that the collision was the "consequence" of the warlike operation; [12] other cases cannot easily be reconciled with such a result.[13] Indeed, in one decision, Lord Wright declared that "In many cases reconciliation is impossible. What matters is the decision." [14] And even in those decisions implying that proof of certain facts results in liability as a matter of law, the House of Lords has spoken in terms of factual proximate cause.[15] Their most recent decision construing the words before us states that cases applying the "question of law" technique should be carefully restricted to their holdings; and Lord Normand warned, "The numerous authorities cited can therefore have only a limited bearing on the present issue. . . . [T]hey will easily lead to error if it is attempted to extract from them a principle of law to solve what is a question of fact." [16]

This Court, moreover, has long emphasized that in interpreting insurance contracts reference should be made to considerations of business and insurance practices.[17] The particular English cases relied on by petitioner produced such an unfavorable reaction among that country's underwriters that they revised the clause here involved

[12] *E. g., Attorney-General* v. *Adelaide S. S. Co.,* [1923] A. C. 292; *Board of Trade* v. *Hain S. S. Co.,* [1929] A. C. 534; cf. *Yorkshire Dale S. S. Co.* v. *Minister of War Transport,* [1942] A. C. 691.

[13] *E. g., Clan Line Steamers, Ltd.* v. *Board of Trade,* [1929] A. C. 514; *Liverpool & London War Risks Assn.* v. *Ocean S. S. Co.,* [1948] A. C. 243.

[14] *Yorkshire Dale S. S. Co.* v. *Minister of War Transport,* [1942] A. C. 691, 708.

[15] See cases·cited in note 12, *supra.* England has enacted the proximate cause test into its statutory law. Marine Insurance Act of 1906, 6 Edw. VII, c. 41, § 55 (2).

[16] *Liverpool & London War Risks Assn.* v. *Ocean S. S. Co.,* [1948] A. C. 243, 270.

[17] *General Mut. Ins. Co.* v. *Sherwood,* 14 How. 351, 362.

to avoid the injurious effects of those decisions.[18] The terms of American war risk policies have also been altered.[19]

The proximate cause method of determining on the facts of each case whether a loss was the "consequence" of warlike operations may fall short of achieving perfect results. For those insured and those insuring cannot predict with certainty what a trier of fact might decide is the predominant cause of loss. But neither could they predict with certainty what particular state of facts might cause a court to discover liability "as a matter of law." Long experience with the proximate cause method in American and English courts has at least proven it adaptable and useful in marine and other insurance cases. There is no reason to believe that its application in this case will disappoint the just expectations of insurer or insured.

The judgment of the Court of Appeals is

*Affirmed.*


MR. JUSTICE FRANKFURTER, joined by MR. JUSTICE JACKSON, dissenting.

Although the parties are the United States and the Standard Oil Company of New Jersey, this is nothing more than an ordinary insurance case. It is before us because of a conflict with the views of the Court of Appeals for the Ninth Circuit in *General Insurance Co. of America* v. *Link,* 173 F. 2d 955. On December 16, 1942, the Standard tanker *Worthington* collided with a United States Navy mine sweeper, the *YMS-12,* engaged in sweeping mines in the channel outside New York harbor. It has been stipulated that the collision "was contributed to both by fault in the navigation of SS John

---

[18] 2 Arnould, Marine Insurance and Average (13th ed., Lord Chorley, 1950), § 905h.

[19] See note 10, *supra.*

Worthington and fault in the navigation of the United States Ship YMS–12, consisting of failures on the part of both vessels to comply with applicable rules for the prevention of collisions and the requirements of good seamanship under the circumstances." The *Worthington* was undamaged, but under admiralty law Standard was liable for half the damage sustained by the mine sweeper since both ships were at fault. Standard, as a self-insurer of its tanker *Worthington,* had assumed all marine risks except those undertaken by the United States, the charterer of the vessel. The Government's undertaking was to insure against "all consequences of hostilities or warlike operations." [1]

The United States filed a libel against Standard to recover for one-half the damage to the Navy mine sweeper. Standard answered that the United States, as insurer of the tanker, would, in view of the nature of the

---

[1] The *Worthington* was under requisition time charter to the United States at the time of collision. Clause 20 of Part II of the charter provided:

"Unless otherwise mutually arranged, at all times during the currency of this Charter the Charterer shall provide and pay for or assume: (i) insurance on the Vessel, under the terms and conditions of the full form of standard hull war risk policy of the War Shipping Administration, . . . ."

The clause further provided that Standard should assume or insure against all risks "[e]xcept as to risks or liabilities assumed, insured or indemnified against by the Charterer [i. e. the United States] . . . ."

The Government provided insurance against risks arising from hostilities or warlike operations by an involute and somewhat enigmatic set of forms. A binder of insurance issued to Standard by the United States provided: "3. This binder shall be subject to all the rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration. . . ." Endorsement No. 1 to the binder also provided: "2. This insurance shall be subject to all the rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration in force at the time of issuance of the binder and shall be subject to the terms of the requisition

collision, have to reimburse Standard for any loss it sustained in the suit.[2]   The District Court dismissed the libel upon this theory.   81 F. Supp. 183.   The Court of Ap-

charter party relative to this vessel accepted by the assured and any modifications or amendments thereto."

The standard War Shipping Administration policy form referred to in the charter and binder included the following clauses:

"*F. C. & S. Clause.   Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or resulting from capture, seizure, arrest, restraint, or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion, or insurrection, or civil strife arising therefrom.*

"*If war risks are hereafter insured by endorsement on the Policy, such endorsement shall supersede the above warranty only to the extent that their terms are inconsistent and only while such war risk endorsement remains in force.*"

An endorsement to the policy form further provided:

"It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty."

[2] In a letter to Standard counsel dated December 14, 1945, the Acting Chief Adjuster, Division of Maritime Insurance, stated that "any claim or suit by the United States of America, as Owners of the ship Y.M.S.–12, in which we might prove to be concerned, would be waived."

See Interdepartmental Waiver promulgated by War Shipping Administration in Legal Bulletin W. S. A. No. 23, Part II, dated January 14, 1943:

"II. *Inter-Departmental Claims*

"Generally stated, it can be said that all types of maritime claims in favor of or against a Government department or agency, such as War Shipping Administration, Army, Navy, Lend-Lease Administration, etc., which claims are in turn for or against another United States Government department or agency, are to be waived and will not be asserted or pressed to final conclusion. . . ."

peals for the Second Circuit reversed, 178 F. 2d 488, and this Court granted certiorari, 339 U. S. 977, because, as already noted, there was a conflict between the Second and Ninth Circuits.

In granting without limitation the petition for certiorari, we brought here all that by fair implication is contained in the following question: "Is a collision between a war vessel engaged on a warlike operation and a merchant vessel, with fault on the part of both vessels, a consequence of the warlike operation of the war vessel?" I do not think it is permissible to limit the question that was brought here by an assumption that there was no proof of relation between the peculiar risks due to the warlike operation and the loss. The District Court found a connection between the loss and the risks incident to the warlike operation. The Court of Appeals opinion discussed at length the standard upon which such a finding is based. The petitioner's submission here seems clearly to adhere to the ground on which he prevailed in the District Court. It is true that where the standard to be applied to the facts is clear, we ought not to be concerned over a difference of view regarding the facts between the District Court and Court of Appeals. But where the clash of views may involve the meaning of the standard to be applied to the facts, it makes for uncertainty if this Court fails to consider the problem fully. The "proximate cause" standard of insurance liability is, at best, an elusive concept. It acquires more vivid meaning when abstract discussion leads to an application of the principle.

Since the issue is the scope to be given the words "all consequences of hostilities or warlike operations," it is important to place the phrase in its historic setting. Phrases like other organisms must be related to their environment. It furthers clarity explicitly to set to one side a group of cases construing an earlier phrase which arose in a different setting. In several cases the Court of

Claims and this Court had occasion to consider a provision in Civil War charters and later Government charters whereby the Government assumed the "war risk" for the vessels. When first called upon to construe the charter provision "war risk," the Court of Claims specifically noted that it was not dealing with a standard marine insurance clause and construed the words to mean "acts of the public enemy" or "casualties of war." *Bogert* v. *United States,* 2 Ct. Cl. 159, 163. This restrictive definition was reiterated in *Morgan* v. *United States,* 5 Ct. Cl. 182, 189–190, which was affirmed in 14 Wall. 531, and became settled doctrine in the subsequent cases involving the "war risk" charter term.

The clause that is our concern, "all consequences of hostilities or warlike operations," was not derived from the American "war risk" charter term and therefore is not to draw its meaning from the cases construing that term. It is a clause evolved by English maritime insurers. See the opinion of Lord Justice Atkin in *Britain S. S. Co.* v. *The King,* [1919] 2 K. B. 670, 692–693. And the language has often been construed in English courts. See *Yorkshire Dale S. S. Co.* v. *Minister of War Transport,* [1942] A. C. 691, 703, 714, for a discussion of the cases by Lord Wright and Lord Porter. It is only natural that American courts have looked to the English cases for illumination just as courts look to the decisions of another State for aid in determining the meaning of a statute adopted from that State. Provisions in a standard contract form become words of art, and their content is most dependably arrived at by considering the origin of the words and the meaning they have in practice acquired. These are considerations making for appropriate construction and do not imply subservience to English decisions.

Two problems arise in construing the clause: (1) What constitutes "hostilities or warlike operations?" (2) What is the sweep of the words "all consequences?" The first

question, which has presented great difficulties in cases involving convoys and blacked-out vessels, has been removed from the case by a stipulation that the mine sweeper was engaged in sweeping mines—beyond dispute a warlike operation. A warlike operation does not lose its warlike character because it is carried out negligently.

The only question before the Court is whether the collision was a "consequence" of the warlike operation, or, in the jargon of insurance cases, whether the warlike operation was the "proximate cause" of the collision. "Proximate cause," as a requirement of liability under an insurance policy, is not a technical legal conception but a convenient tag for the law's response to good sense. It is shorthand for saying that there must be such a nexus between the policy term under which insurance money is claimed and the events giving rise to the loss that it can be fairly declared that the loss was within the risk assumed. The case is one of "common-sense accommodation of judgment to kaleidoscopic situations." *Gully* v. *First National Bank*, 299 U. S. 109, 117.

Unlike obligations flowing from duties imposed upon people willy-nilly, an insurance policy is a voluntary undertaking by which obligations are voluntarily assumed. Therefore the subtleties and sophistries of tort liability for negligence are not to be applied in construing the covenants of a policy. It is one thing for the law to impose liability by its own notions of responsibility, and quite another to construe the scope of engagements bought and paid for. The law of marine insurance is concerned with and reflects the practicalities of commercial dealings. The law does not play an unreal metaphysical game of trying to find a single isolatable factor as the sole responsibility to which is to be attributed a loss against which insurance has been bought. As a matter of experience and reason such losses are invariably the resultant of a combination of factors. The scope of the undertaking

to cover for such losses is partly the law's confirmation of the settled understanding of those whose business is shipping—their understanding of what contingencies the undertaking covered. It is partly the law's endeavor, in view of the inevitable treacheries of language, to shield the insurer from liability for a loss on the basis of a factor too remote, and therefore too tenuous, in the combination of elements that converged toward the loss.

Looking to the facts of this case and the terms of the contract, does the failure of both vessels "to comply with applicable rules for the prevention of collisions and the requirements of good seamanship under the circumstances" relieve of responsibility the insurer against all consequences of hostilities and warlike operations? In other words, does contributory negligence in relation to a warlike operation displace the warlike operation as an effective force in bringing about a loss?

The collision occurred between 5 and 6 a. m. on December 16, 1942, in the swept channel in the approaches to New York harbor. The *YMS–12* was proceeding seaward with her mine-sweeping gear streamed. She was the starboard vessel in a formation of three mine sweepers engaged in sweeping the buoyed channel. In the words of the District Judge, who questioned counsel closely on the way in which mine sweeping was carried on:

> "Here, concededly, negligence in navigation existed on the part of both masters, but that negligence did not break the chain of causation so as to prevent the loss from being attributable to the warlike operation. The YMS–12 and the two accompanying vessels, in mine sweeping formation, proceeding with mine sweeping gear streamed and trailing paravanes, presented an unusual and unexpected obstacle to navigation. YMS–105 was the guide ship of the formation, the YMS–12 was stationed several hundred yards on the starboard beam of the YMS–105 and

the third vessel in the formation, the AMC–95, was echelon to the right of the guide ship, in a position approximately a half mile astern and midway between the YMS–105 and the YMS–12. From the time of the encounter until actual collision the vessels continued in their mine sweeping operations with their paravanes trailing; in all her manoeuvres and in her navigation the YMS–12 was necessarily restricted and impeded. This unusual formation, of which the YMS–12 was a part, closed to the S. S. John Worthington lanes of navigation affording possible escape which would ordinarily have been open to her.

"The negligence found to exist was negligence 'under the circumstances' of the special and extraordinary conditions existing—conditions created by the warlike operation of mine sweeping." 81 F. Supp. 183, 191.

Whether the Court of Appeals reached its decision by application of an erroneous rule of law, by the erroneous application of the proper rule of law, or by an erroneous construction of the stipulation of fact made by the parties is not clear. In any case, it should be reversed. If the matter is viewed simply—according to the fair judgment of men of commerce and clear of beclouding abstractions—one can hardly escape the conclusion of the District Court. The fact that the English courts have reached the same conclusion in similar cases does not weaken its force. See *Board of Trade* v. *Hain S. S. Co.*, [1929] A. C. 534; *Attorney-General* v. *Adelaide S. S. Co.*, [1923] A. C. 292.

The Government makes a second contention: that its war-risk undertaking did not extend to collision liability. Since the only loss to Standard was a liability for damage to the other ship, this argument would relieve the Government of its liability as insurer. The contention finds support in *Adelaide S. S. Co.* v. *Attorney-General* (*The Second Warilda*), [1926] A. C. 172. But subsequent

changes in the wording of the policy make it perfectly plain that the United States insured against collision liability.[3]

---

[3] The corresponding insurance provisions in the *Second Warilda* and the present case are set forth below:

| *Warilda*<br>[1926] A. C. at 177–178 | *Worthington*<br>"WAR RISK CLAUSES |
|---|---|
| "19. The risks of war which are taken by the Admiralty are those risks which would be excluded from an ordinary English policy of marine insurance by the following, or similar, but not more extensive clause: | "It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty. . . . |
| | "*F. C. & S. Clause* |
| | "*Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or resulting from capture, seizure, arrest, restraint, or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; also from all consequences of hostilities or warlike operations. . . .* |
| " 'Warranted free of capture, seizure, and detention and the consequences thereof, or of any attempt thereat, piracy excepted, and also from all consequences of hostilities or warlike operations whether before or after declaration of war.' " | "*If war risks are hereafter insured by endorsement on the Policy, such endorsement shall supersede the above warranty only to the extent that their terms are inconsistent and only while such war risk endorsement remains in force.*" |

MR. JUSTICE DOUGLAS, dissenting.

We have here a question not of tort liability but of the determination of insurance coverage. The accidents which had been held to be covered by this insurance clause prior to 1942, when this contract was made, would therefore seem to be the reliable standards for interpretation. *Board of Trade* v. *Hain S. S. Co.,* [1929] A. C. 534, and *Attorney-General* v. *Adelaide S. S. Co.,* [1923] A. C. 292, dealt with this precise situation and held that where a ship engaged in a warlike operation collided with another vessel partly or wholly due to faulty navigation on its part the war insurer was liable. Adherence to British precedents in this field was early admonished. *Queen Ins. Co.* v. *Globe Ins. Co.,* 263 U. S. 487, 493. The rule of the foregoing English cases is for me the most authentic standard for interpreting the present contract. See *General Ins. Co.* v. *Link,* 173 F. 2d 955. And none of the cases cited as casting doubt on their holdings presents a contrary result on a similar set of facts.