**FLOTA MERCANTE DOMINICANA, C. POR A. Owner of the SS SANTO DOMINGO, Plaintiff,**

v.

**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Defendant.**

**FLOTA MERCANTE DOMINICANA, C. POR A. Owner of the SS SANTO DOMINGO, Plaintiff,**

v.

**AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY et al., Defendants.**

**Nos. 66 Civ. 1651; 67 Civ. 4255.**

United States District Court,
S. D. New York.

April 22, 1970.

See also, D.C., 272 F.Supp. 540.

Zock, Petrie, Sheneman & Reid, New York City, by Francis J. O'Brien and

Howard M. McCormack, New York City, for plaintiff.

Hepburn & Troy, New York City, by William P. Hepburn, for defendant American Manufacturers Mutual Ins. Co. as war risk underwriters.

Mendes & Mount, New York City, by John J. Sullivan, for defendants American Manufacturers Mutual Ins. Co. and others as marine hull underwriters.

TYLER, District Judge.

Plaintiff was the owner of the SS SANTO DOMINGO which burned and sank in the harbor of Santo Domingo, Dominican Republic, following shelling by members of the U.S. Armed Forces on May 4 and 5, 1965. The ship was a constructive total loss. Plaintiff first sued American Manufacturers Mutual Insurance Co. ("AMMI") to collect under a war risk policy insuring the ship. AMMI raises three defenses to this action: (1) the proximate cause of the sinking was not a war risk but the barratry of the master and crew, a peril covered by the hull underwriters rather than the war risk underwriters; (2) alternatively, the proximate cause of the loss was a "captive, seizure, arrest, restraint, detainment, preemption, confiscation or requisition" by the Dominican government and that peril is specifically excluded from the war risk policy; (3) regardless of the proximate cause of loss, there was a requisition of the ship by the Dominican Republic prior to the loss and, by the terms of the policy, requisition automatically cancelled the war risk insurance.

In the face of these defenses, plaintiff filed a second action, consolidated with the first for trial which took place before the court on February 9, 1970, against the syndicate of hull underwriters, claiming payment under the hull policy if the proximate cause of the loss should be found to be the barratry of the master and crew or any other cause not excluded by the policy's free of capture and seizure clause. The hull underwriters contend that the proximate cause of the loss of the vessel falls squarely within the exceptions of the free of capture and seizure clause.

The determination of the proximate cause of the loss of the ship requires an exposition of the circumstances of the burning and sinking. On April 24, 1965, the vessel cleared New York bound for Santo Domingo. The same day the news of the uprising in the Dominican Republic reached the ship. According to the testimony of the ship's captain, the broadcasts were greeted with nervous excitement by the crew. There was considerable drinking of alcoholic beverages, much hanging about the radio operator's quarters and a general loosening of the crew's discipline. A couple of days out of Santo Domingo, a deputation led by the first cook waited on the captain and persuaded him to permit transmission of a message sympathetic to the new constitution.

On approaching the harbor of Santo Domingo, the captain held a meeting of the officers to discuss the question of putting into the harbor. The captain's orders on leaving New York were to proceed to Santo Domingo, and he had received no change in those orders. He had had previous experience with navigating during revolutions, coups and uprisings in the Dominican Republic, none of which had resulted in seriously damaging consequences. Moreover, the atmosphere on ship was tense (the captain slept with a hand gun beneath his pillow), and the crew had made it clear by their behavior that they wished to enter Santo Domingo. In these circumstances, it was decided to enter the port.

The ship went into Santo Domingo on April 29 and tied up in the Ozama River about 200 meters from a fort then in the hands of National Police loyal to the regime which had been in power when the troubles broke out. The captain gave both crew and passengers instructions to remain on the ship while he went ashore to investigate the situation. The captain attempted to get in touch with the owners of the vessel and to ascertain the conditions in the town. He quickly discovered that he was in the center of a

battlefield and he was unable to return to the ship.

It is unclear what the crew and passengers did to care for themselves, but the succeeding events suggest that within the next several hours each sought safety or excitement with the army of his choice.

The next day the forces in the fort next to the ship, roughly 1,000 National Police, came under heavy pressure from the new constitutionalists, who appear to have taken command of those parts of the city lying on the side of the fort away from the river. Further, the National Police in the fort had had nothing to eat for three days. An evacuation of the fort was ordered. Four to five hundred of the retreating police went aboard the SS SANTO DOMINGO, which apparently was empty at that time, seeking refuge, food and modes of escape from the opposing forces. An unsuccessful attempt was made to release the ship from her moorings (by firing machine gun volleys at the cables), a couple of the lifeboats were used to ferry the troops across the Ozama River and whatever food and clothes were found aboard were taken. Within the space of several hours, the ship was abandoned by the retreating police forces.

The vessel was then rapidly occupied by the rebel forces. The new occupants of the ship used it to direct fire at elements of the 82nd Airborne Division which had been sent to the Dominican Republic under the executive order of President Johnson to protect American nationals and had taken up positions on the other side of the Ozama River. There were exchanges between the American and Dominican rebel forces which came to an end when the Americans resorted to the use of 106 mm explosive shells. Hits by two of these shells on May 4th and 5th caused the ship to burn and sink so that she became a constructive total loss.

In order to assign liability under either the general hull insurance or the war risk policy, this court must find the proximate cause of the loss of the ship and then determine whether that cause fell within any of the exceptions of the policy involved. In order to achieve some degree of certainty in assigning liability, admiralty courts have relied on the maxim of *causa proxima non remota spectatur* and when interpreting the notion of proximate cause in marine insurance cases have tended to apply it stringently. Standard Oil Co. of New Jersey v. United States, 340 U.S. 54, 58, 71 S. Ct. 135, 95 L.Ed. 68 (1950), Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co., 302 U.S. 556, 562, 58 S.Ct. 371, 82 L.Ed. 422 (1938). 2 Arnould on Marine Insurance (13th ed., Chorley, 1950) § 785. Thus, searching backward from the caused event for the proximate cause, the courts have sought out the first cause from which the event flows in a natural, almost mechanical and inevitable manner; what has been called "the real efficient cause of the loss." *Lanasa Fruit, supra*, at 572, 58 S. Ct. at 378.[1] This canon of stringent construction is helpful in assigning liability and in providing a measure of predictability by which shipowners and underwriters can measure risk and set rates. Yet, ultimately the courts must employ the fallible judgments of common sense in deciding which strand in the net of causation is the proximate cause of the accident.[2]

1. As the extreme example of this principle, and one suggestive in the case at bar, the commentaries cite Green v. Elmslie, 170 Eng.Rep. (Reprint) 156 (1794), in which a ship was driven ashore by wind and in that situation was captured by an enemy; Lord Kenyon found the case too clear to admit argument and imputed the loss to the capture "for had the ship been driven on any other coast but that of an enemy, she would have been in perfect safety." 3 Kent's Commentaries (14th ed., Gould, 1896), 302; 6 Couch, Cyclopedia of Insurance Law (1930) § 1472.

2. The facts of this case, as of so many others, are an illustration of Lord Shaw's observation that "causation is not a chain, but a net." Leyland Shipping Co. v. Norwich Union Fire Ins. Society [1918] A.C. 350, 369.

■ In the circumstances of this case, I find that the proximate cause of the loss certainly lies no further back than the occupation of the ship by the new constitutionalist or rebel party. The decision of the rebel forces to fire on the Americans was the immediate cause of the return fire from the Americans which sank the ship. The rebel decision to fire was an independent one, not mechanically or inevitably flowing from what had gone before, but rather a calculated tactical or strategic risk.[3] Neither the alleged barratry of the master and crew nor the actions of the Dominican government forced forward the actions of the rebels or the Americans in a mechanical or inevitable manner.

Thus, the sinking of the ship was proximately caused by the risks of war and AMMI's contentions that barratry of the master and crew or "capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition" by the Dominican government (if such indeed took place) proximately caused the loss must be dismissed.

■ AMMI next raises the defense that when the National Police boarded the ship on April 30th, the war risk policy was automatically terminated under the terms of a clause that cancelled coverage upon requisition of the ship by the country in which she was owned or registered, i. e. the Dominican Republic.

Neither plaintiff nor AMMI has produced significant evidence indicating the intent of the parties in including the phrase in the insurance contract. There does not seem to be a wealth of cases in which "requisition" is carefully defined. AMMI's trial brief does not lead one to a single instance in which the issue has been litigated, nor could plaintiff find anything near the mark. There are a few suggestive sources for the interpretation of this word. Oppenheim describes requisition as "the name for the demand for the supply of all kinds of articles necessary for an army." 2 Oppenheim's International Law (7th ed., Lauterpacht, 1955) § 147. Article LII of the Second Hague Conventions signed by both the U.S. and the Dominican Republic lays out rules for the making of requisitions: that they shall be made only by the commander in the locality and shall be paid for as far as possible in cash or a receipt given. 2 Treaties, Conventions, International Acts, Protocols and Agreements between the U.S. and Other Powers 1776–1909, 2220, 2289. Admittedly, this article covers land warfare, and the particular article deals with authority over the territory of a hostile state. Nevertheless, both these sources suggest that in requisitioning there is an aspect of formalism which flows from considered military decisions. That element is certainly not present in the floundering retreat of the National Police across the decks of the SS SANTO DOMINGO.

Another way of coming at what was meant by "requisition" in this policy is to look at the termination clause in the context of the entire contract. An earlier clause excepts from the coverage of the war risk policy "any claim arising from capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition" by the country in which the vessel is owned or registered, i. e. the Dominican Republic. It is reasonable to assume that this list is more than repetitious surplusage and that something more is meant by requisition than was meant by the seven preceding words. That is re-enforced when requisition alone is singled out as a basis for automatic termination. This special treatment of requisition separate from the

---

3. It may be that the proximate cause of the ship's loss lies even closer to the actual sinking and is lodged in the American decision to use relatively large caliber artillery shells. If so, it makes no difference to the legal conclusion of liability. It has already been ruled by Judge Frankel of this court that if American firing was the proximate cause of the loss, AMMI cannot escape liability under the war risk policy. Flota Mercante Dominicana C. Por A. v. Am. Manufacturers Mutual Insurance Co., 272 F.Supp. 540 (S.D.N.Y.1967).

usual incidents of war risk again points toward the process of formal demand and taking that was indicated by Oppenheim and the Second Hague Conventions. Such an interpretation also seems to make business sense, being aimed at ending the liability of the war risk underwriter when the ship is formally taken by a government against whom the owner would have a claim for payment and whose use of the ship might well entail risks uncalculated by the underwriter when the policy was issued.

Finally, the canon of construction which directs one to construe the ambiguities of a contract against the writer of the contract indicates that one should resolve the uncertainty of the meaning of "requisition" against AMMI and find that "requisition" in this policy means something much closer to formal civil condemnation than a swift rummage through the ship by four hundred or more hungry, frightened policemen who made off with the food and lifeboats and some of the goods. Neither party has produced significant evidence of other meaning that would lead me to ignore the *contra proferentem* canon.

In light of the facts and the foregoing interpretation of the contractual language, I find that there was no requisition by the Dominican government and that therefore liability for the total constructive loss of the SS. SANTO DOMINGO falls on the war risk underwriter, AMMI.

The facts of this case are interesting, and the legal problems it presents can be said to be comparatively intricate. But extended litigation does not seem the most inexpensive and effective way of dealing with many of these problems. More than ten years ago, Gilmore & Black made a simple suggestion that is much on point here: "Where possible, the sound plan is for the assured to place his marine and war risks with the same underwriter, so that the question which sort of risk has caused his loss

can have no practical importance." Gilmore & Black, The Law of Admiralty, § 2–11 (1957).

■ I further find that the Dominican government has assigned all its rights in this cause to plaintiff and that it is not an indispensable party to this litigation.

■ As a discretionary matter, pre-judgment interest on the full amount of the policy, $630,000, from September 21, 1965, the date on which the notice of abandonment was tendered to the war risk underwriter, is awarded to the plaintiff. The insured owner should not suffer from the four and a half year delay in the payment on the policy, nor should defendant gain by having had the use of funds to which the insured was entitled upon its notice to the insurer. The parties should be put in the position they would have occupied had timely payment of the disputed sum been made. Louisiana & Arkansas R. R. Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir. 1966), United States v. Eastern Air Lines, Inc., 366 F.2d 316, 321 (2d Cir. 1966), R. P. Farnsworth & Co. v. New York Central Float #66, 64 Ad. 823 (S.D.N.Y. July 28, 1969).

Neither party has sufficiently briefed the question of liability for the $38,000 bill for salvage costs. Papers on this point should be submitted within the next twenty days.

There appearing no just reason for delay, judgment for plaintiff against AMMI, the war risk underwriter, for the full amount of the policy, $630,000, with 6% interest from September 21, 1965, may be entered at once. Rule 54(b), Fed.R.Civ.P. Decision is reserved on the question of liability for salvage, to be briefed by the parties within twenty days of the filing of this opinion, which shall constitute the findings of fact and conclusions of law on the main issue. Rule 52, Fed.R.Civ.P.