**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**TIMBALIER TOWING COMPANY, INC., et al., Defendants.**

Civ. A. No. C78–927.

United States District Court, N. D. Ohio, E. D.

Aug. 20, 1980.

As Amended Aug. 28, 1980

---

Arthur J. Rowbotham, Schneider, Smeltz, Huston & Bissell, Cleveland, Ohio, for plaintiff.

Harley J. McNeal, McNeal, Schick & Archibald, Marvin L. Karp, Ulmer, Berne, Laronge, Glickman & Curtis, Henry B. Bruner, Thompson, Hine & Flory, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Invoking the Court's jurisdiction under 12 U.S.C. § 1819 and 28 U.S.C. § 1345, plaintiff Federal Deposit Insurance Corporation (FDIC) in its corporate capacity initiated this action on July 28, 1978 against Timbalier Towing Company (Timbalier); Donald W. Durant, a director and shareholder as well as the president of Timbalier; Associated Developers International, Inc., (ADI); Alex Dandy, ADI's president; and K. Bell Associates, Inc. (K. Bell).[1] FDIC instituted the action against Timbalier, Durant, ADI, and Dandy to recover jointly and severally for the amount due on an installment promissory note, and against K. Bell to recover for negligent failure to pay the plaintiff, as loss payee, the proceeds of an insurance policy. By the December 26, 1978 amended complaint, FDIC asserted that on the basis of an alleged agreement to be bound, Lilah A. Dandy, Alex Dandy's wife, was liable for the amount due on the note. Timbalier and ADI cross-claimed against each other, and ADI cross-claimed against K. Bell for indemnification in the event judgment is rendered in favor of the plaintiff.[2]

The Court duly heard testimony and received exhibits on November 28, 29, and 30, 1979. Incorporating the parties' trial stipulations, the Court makes findings of fact and reaches conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

### A. Facts[3]

1. Plaintiff FDIC is a corporation organized and existing under an Act of Congress of the United States.

2. Defendant Timbalier is a Louisiana corporation with its principal place of business in Louisiana.

3. Defendant Durant is an individual residing in Louisiana.

4. Defendant ADI is a District of Columbia corporation with its principal place of business in Washington, D.C.

5. Defendants Alex and Lilah Dandy are individuals residing in Maryland.

6. Defendant K. Bell is a New York corporation with its principal business in New York.

7. Cayman International Towing, Ltd. (Cayman International) is a corporation incorporated in the Cayman Islands with its principal place of business in Louisiana.

8. Durant is the sole shareholder, the president, and a director of Indian Towing Co. (Indian Towing), a corporation with its principal place of business in Louisiana. Timbalier and various other owning compa-

---

1. Other defendants have been named and dismissed at various stages in the proceedings. Lloyds of London, d. b. a. Underwriters at Lloyds, Inc., was dismissed by Court Order on March 21, 1979. Andrew P. Van Oosten, Cayman International Towing, Inc., and Institute of London Underwriters Companies were dismissed by two Orders, both dated July 25, 1979.

2. A counterclaim by Timbalier against the plaintiff was dismissed by Court Order on July 23, 1979.

3. By stipulation paragraph 28 the parties waive the necessity of filing depositions with the Court prior to trial. The Court customarily refused to consider deposition evidence to which the parties have stipulated but which had not been certified and filed pursuant to Rule 30(f). See Glenwillow Landfill, Inc., v. City of Akron, 485 F.Supp. 671, 674 n. 2 (N.D. Ohio 1979), appeal pending, No. 80–312 (6th Cir., filed Jan. 7, 1980). In the present case, however, the Court in its discretion ruled from the bench that the Durant deposition would be received into evidence.

nies have the same corporate structure and business address as Indian Towing, with the possible exception that Indian Towing rather than Durant may be the sole shareholder of the various other companies.[4] Indian Towing, the only one of Durant's companies that hires employees, acts as operating agent for Timbalier, Cayman International, Cayman Shipping Corp., and the numerous other towing and/or shipping companies.

9. Van Oosten is an administrator director for Indian Towing and acts as agent for the companies that Indian Towing operates. One of Van Oosten's responsibilities is to handle insurance matters.

10. Timbalier purchased the vessel John Roen IV, later named "Shawnee," for $200,-000.00 on June 12, 1973.

11. In June, 1973 Van Oosten arranged through K. Bell for the placing of insurance on the Shawnee, which insurance became effective at 12:00 P.M., June 12, 1973. Indian Towing was listed as an insured.

12. On or about June 28, 1973, defendant Alex Dandy executed and delivered to NOB his Agreement to be bound as co-maker of all notes or other evidence of indebtedness and obligations of ADI to NOB then made or thereafter to be made. He undertook personal liability to the extent of $250,000.00.

13. ADI, Northern Ohio Bank (NOB), and Timbalier by their principals entered into a financial agreement. Timbalier viewed the agreement as one whereby ADI secured financing from NOB for Timbalier. NOB and ADI viewed the agreement as a loan to ADI, secured in part by Timbalier's note. None of the defendants has submitted written evidence of the three-way agreement.

14. On or about July 16, 1973 defendant Timbalier, by and through its duly authorized representative, defendant Durant, executed an installment promissory note dated July 16, 1973, which note was endorsed by Mr. Durant.

15. The installment promissory note as executed and delivered by Durant on behalf of Timbalier is made payable to ADI in the amount of $415,000 ($300,000 principal plus $115,000 add-on interest) with 8 percent per annum interest after maturity. The maker agrees on the face of the note to pay a reasonable amount in attorney's fees in the event of a default in payment at maturity, without regard to whether maturity is brought about by exercise of the acceleration clause. The note provides that it is secured by a first preferred ship mortgage covering the vessel Shawnee.

16. On or about July 20, 1973 defendant ADI, by and through its duly authorized representative, marked the note "pay to the order of Northern Bank with full recourse", and endorsed it.

17. On the same date, ADI by and through its duly authorized representative executed and delivered to NOB a document entitled "Assignment".

18. By virtue of the assignment as executed and delivered on behalf of ADI to NOB, all rights, title, and interest due ADI under the note were assigned to NOB. In the assignment, ADI guarantees payment of all sums payable under the promissory note, including attorney's fees.

19. Of the $300,000 principal amount of the loan distributed on or about July 20, 1973, $225,000 was disbursed to Indian Towing for Timbalier and $75,000 was disbursed to ADI.

20. There was conflicting evidence regarding whether Durant, on behalf of Timbalier, knew and approved of the disbursement. Alex Dandy, president of ADI, testified that he telephoned Durant to inform him of the allocation of funds. But Durant in deposition testimony indicates that he was the one who initiated contact with Dandy immediately upon learning that only $225,000 of the $300,000 was channeled to Indian Towing for Timbalier.

4. Durant was not sure during his deposition whether he or Indian Towing was the shareholder.

21. The first written indication that Durant was dissatisfied with the disbursement was on March 8, 1974. Durant stated in a letter to NOB that it was his understanding that NOB would credit Timbalier's promissory note for the amount received by ADI. The letter was signed by Durant, but not approved by NOB or ADI.

22. On or about September 14, 1973, Timbalier transferred legal title of the Shawnee to Cayman International.

23. In early 1974, Cayman International by and through its duly authorized representative, Van Oosten, executed and delivered a mortgage on the diesel tug Shawnee to NOB and its assignees in the same principal amount and interest rate as stated in the promissory note. The mortgage was dated July 16, 1973 and was designated as a first preferred ship mortgage.

24. On February 14, 1975, pursuant to Chapter 1113 of the Ohio Revised Code, the superintendent of the banks of Ohio took possession of the business and property of NOB. Thereafter, pursuant to the same chapter, FDIC was appointed receiver for NOB, and title to all assets, business, and property of NOB was transferred to FDIC.

25. On or about February 17, 1975, FDIC in its capacity as duly appointed receiver for NOB and pursuant to Ohio Rev. Code Ann. § 1113.05(M) (Page), as approved by an Order of the Cuyahoga County Court of Common Pleas, entered into an agreement providing for the sale, assignment, and transfer of certain assets of NOB to FDIC in its corporate capacity and also to National City Bank.

26. The note, mortgage, and assignment of ADI were among the assets sold, assigned, and transferred to FDIC pursuant to the transfer agreement and an assignment dated February 17, 1975.

27. Pursuant to the transfer agreement and the FDIC assignment, FDIC is the owner and holder of the note, mortgage, and assignment of ADI.

28. On or about April 12, 1975, Timbalier and Durant were notified by FDIC that FDIC was the holder by assignment of the promissory note from Timbalier to ADI.

29. By letter of April 22, 1975, Durant suggested to Alex Dandy that the $75,000 channeled to ADI could be treated as a loan to ADI from Timbalier. There was no evidence presented at trial that ADI accepted the suggestion or that the FDIC liquidator consented to same.

30. Insurance was placed on the tug Shawnee through the insurance brokerage agency of defendant K. Bell with certain underwriters at Lloyds of London and at the Institute of London Underwriters Companies.

31. "ADI and/or its assigns" were listed as additional assureds on the Shawnee insurance policy as of July 19, 1973. When NOB was named loss payee on the May 3, 1974 Endorsement No. 2, ADI and/or its assignees were included "as their respective rights and interests may appear." On Endorsement No. 4, issued May 21, 1974, NOB was denominated an additional insured, but no reference was made to ADI.[5] ADI was thereby deleted from the policy as an additional assured.

32. Trial testimony indicates that ADI was never notified that it was being eliminated from coverage.

33. On May 13, 1975, the FDIC liquidator of the NOB wrote to Durant informing him that according to bank records, insurance on the Shawnee had expired. The liquidator reminded Durant of the requirement to keep insurance coverage on the vessel and requested a new certificate of insurance.

34. Durant forwarded the FDIC letter to K. Bell along with a request that K. Bell comply with the letter. K. Bell sent FDIC a cover note that named FDIC as the loss payee/mortgagee on the insurance through December 31, 1975.

35. K. Bell subsequently took steps to renew the insurance coverage on the Shawnee effective January 1, 1976 for 12 months.

5. The parties did not submit an Endorsement No. 3.

36. The 1976 policy was a renewal on the same terms and conditions as contained in the 1975 policy, including the provision for FDIC as loss payee/mortgagee.

37. Keith Bell, president of K. Bell, testified that sometime between January 5 and 9, 1976, Van Oosten advised K. Bell that the FDIC was not to be included as a loss payee on the 1976 policy. Bell asserts he did not send notice of the deletion to the principals in London because of representations made by Van Oosten that he would notify the London brokers. Van Oosten in deposition denies that he ever discussed the FDIC or NOB with Bell or any of the London brokers or underwriters after 1974. The Court, finding Bell to be the more credible witness, finds that FDIC was deleted as loss payee on the 1976 policy pursuant to instructions by the vessel owner's representative.

38. FDIC did not receive notice that as of January 1, 1976 it was not included as a loss payee on the 1976 policy.

39. K. Bell did not notify FDIC that it was deleted as loss payee/mortgagee on the 1976 policy of insurance covering the Shawnee; nor did K. Bell require Shawnee's owner, Cayman International, to submit a certificate or letter of satisfaction or a satisfaction of mortgage from FDIC substantiating that FDIC had no further interest in the insurance proceeds.

40. On July 4, 1976, the Shawnee ran aground off the San Andres Island, near the coast of Colombia, South America, and was a total loss.

41. As of July 4, 1976, neither NOB nor FDIC was listed as a loss payee/mortgagee on any insurance placed through K. Bell covering the tug Shawnee.

42. As of July 4, 1976 ADI was not listed as an additional assured on any insurance placed through K. Bell covering the Shawnee.

43. On September 23, 1976 and October 6, 1976, K. Bell disbursed a total of $150,000 in insurance proceeds to the bank account of Indian Towing for the loss of the Shawnee. The remaining proceeds were held back by K. Bell for past insurance premiums due.

44. FDIC has never received any insurance proceeds relating to the loss of the Shawnee.

45. In January, 1977, Van Oosten, as administrator director of Cayman International, signed a bill of sale of the Shawnee to Transportes Maritimos Husted's S.A., a salvage company. The bill of sale stated in part that Cayman International is "the absolute owner of said vessel and that the vessel is free and clear of all liens and encumbrances and that it has full right, power, and authority to transfer said vessel and property and to make this bill of sale."

46. By a letter dated July 23, 1976, Van Oosten notified the NOB of the July 4, 1976 casualty to the Shawnee. The FDIC's "Received" stamp shows January 11, 1978, as the date on which notice was received.

47. FDIC declared the Timbalier note in default on July 18, 1978.

48. The accounting records of FDIC and NOB establish the amount outstanding on the Timbalier note as of November 27, 1979 to be $134,247.97.

B. *Applicable Law*

Under authority of Congress, the FDIC has power "[t]o sue and be sued. . . . All suits . . . shall be deemed to arise under the laws of the United States." 12 U.S.C. § 1819. The United States Supreme Court has found that Congress expressed its intent that in addition to the federal courts' having jurisdiction over matters concerning the FDIC, the courts would apply federal law. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 456, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942). *See generally FDIC v. First National Finance Co.*, 587 F.2d 1009 (9th Cir. 1978); *FDIC v. Ashley*, 585 F.2d 157, 163 n. 7 (6th Cir. 1978); *Riverside Park Realty Co. v. FDIC*, 465 F.Supp. 305 (M.D.Tenn.1978).

Because there is no federal statutory law defining either the FDIC's rights as holder of a note or the maker's liability on a note, the question arose in *D'Oench* whether the Court could fashion federal law gleaned from all of the source materials of the

common law, or whether the Court was bound to apply law of some particular state. Justice Jackson, in a concurring opinion to the *D'Oench* majority opinion, explained the policy for consistency in cases that are deemed to arise under federal law as follows:

> I do not understand Justice Brandeis's statement in *Erie R. Co. v. Tompkins*, 304 U.S. 64 at 78 [58 S.Ct. 817 at 822, 82 L.Ed. 1188, 114 A.L.R. 1487], that 'There is no federal general common law,' to deny that the common law may in proper cases be an aid to or the basis of decision of federal question. In its context it means to me only that federal courts may not apply their own notions of the common law at variance with applicable state decisions except 'where the constitution, treaties, or statutes of the United States [so] require or provide.' . . .
>
> . . . . .
>
> A federal court sitting in a non–diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced . . . .. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common–law technique of decision and to draw upon all the sources of the common law in cases such as the present. *Board of Commissioners v. United States*, 308 U.S. 343, 350[, 60 S.Ct. 285, 288, 84 L.Ed. 313].

*D'Oench*, supra, 315 U.S. at 469–72, 62 S.Ct. at 685–86.

▮ The federal policy of uniformity of decision for cases arising under federal law would be obviated by a great diversity in results if identical transactions were subject to the vagaries of the laws of several states. Where such inconsistency in decisions would occur, state law is not an appropriate selection to aid in fashioning federal common law. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). If, however, the state law is not contrary to an overriding federal policy and the court cannot ascertain the federal rule by examining federal constitutional, statutory, or available case law, the court may look to appropriate state law. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 297, 61 S.Ct. 995, 998, 85 L.Ed. 1361 (1941); *D'Oench*, supra, 315 U.S. at 473–74, 62 S.Ct. at 686–687. *See also* 1A2 Moore's Federal Practice ¶ 0.305[3], at 3052 (2d rev. ed. 1979).

▮ In some cases brought within the jurisdiction of federal courts and "arising under" federal law, issues of state law may arise. If the court finds no congressional intent to apply federal law, the court looks to the forum state's law for the rule of decision.[6] Rules of Decision Act, 28 U.S.C. § 1652; *D'Oench*, supra; *Watson v. McCabe*, 527 F.2d 286 (6th Cir. 1975).

### C. *FDIC's Claim Against Timbalier and Durant*

FDIC's claim against Timbalier and Durant is for the balance due on a promissory note signed by Durant as president of Timbalier and endorsed by Durant in his individual capacity. Timbalier and Durant raise five affirmative defenses to enforcement of the note: 1) failure to state a claim upon which relief can be granted; 2) failure of consideration; 3) payment; 4) waiver and/or estoppel; and 5) fraud on the part of ADI and/or Alex Dandy and/or NOB.

---

6. The Court need not decide in the present case whether, when looking to the forum state's law in a non–diversity of citizenship case, the Court must apply the forum's choice of law. *Cf. Klaxon Co. v. Sentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (under *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal court sitting in diversity to apply forum state's choice–of–law principles). The United States Supreme Court has so far avoided the choice–of–law issue in non–diversity cases.

Implicit in raising the affirmative defenses is Timablier and Durant's burden of proving them. Rule 8(c), Federal Rules of Civil Procedure. Only the second, third, and fifth defenses were briefed by Timablier and Durant. The Court therefore finds that these defendants have not met their burden of proof on the first defense that plaintiff failed to state against them a claim on which relief could be granted and the fourth defense of waiver and/or estoppel.

■ FDIC argues in response to Timablier and Durant's failure–of–consideration defense that the defense is not available to these defendants as a matter of law. In a suit by FDIC to recover on one of its purchased assets, the failure–of–consideration defense cannot be raised by the maker whose

> note was designed to deceive the [bank's] creditors or the public [banking] authority or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*D'Oench,* supra, 315 U.S. at 460, 62 S.Ct. at 681. In *D'Oench,* the Supreme Court found a federal policy to protect FDIC and the public funds which it administers against misrepresentations as to assets of the banks insured by FDIC. *Id.* at 457 & 459, 62 S.Ct. at 679 & 680. *See also Dasco, Inc. v. American City Bank & Trust Co.,* 429 F.Supp. 767, 770 (D.Nev.1977). Consequently, the courts will not permit parties who had misrepresented the inflated value of a bank asset to raise the true value of the asset as a defense to the FDIC's attempt to collect on the asset.

■ The rule in *D'Oench* is not a general rule that FDIC is never subject to the defense of failure of consideration. *D'Oench* only applies to instances in which the maker of the note made a deceptive scheme possible through his action or inaction. *D'Oench,* supra, 315 U.S. at 460, 62 S.Ct. at 680; *FDIC v. Meo,* 505 F.2d 790, 792–92 (9th Cir. 1974); *FDIC v. Julius Richman, Inc.,* 80 F.R.D. 114, 117 (E.D.N.Y.1978).

The Court finds that by his inaction, Durant in his dual capacity as agent for Timbalier on the note and as endorser of the note contributed to overstatement of NOB's assets. Although Alex Dandy arranged financing for Timbalier and Durant from the NOB, none of the parties reduced to writing an agreement for $300,000 to be directed toward Timbalier and Durant.[7] Assuming, arguendo, that there was an agreement for the full $300,000 in favor of Timbalier, Timbalier and Durant's failure to object when $75,000 was not forthcoming had the effect, on the facts presented, of reducing the assets of NOB.[8] Because Timbalier and Du-

---

**7.** The NOB "Application for Loan" dated 7–20–73, lists ADI as the applicant. On another page of the form, ADI is also listed as the borrower, but a line appears through ADI's name and address, above which is written "Mail Payment Book to: Timbalier [and address]." On the same page as ADI is listed as borrower, under "Disbursement", appears:

> Date <u>7/20/73</u> $225,000.00
>
> Date <u>7/20/73</u> 75,000.00

The information contained in the loan application is insufficient to establish that the parties agreed to a $300,000 loan in favor of Timbalier or that the parties agreed to the $225,000–$75,000 disbursement.

**8.** If the three–way agreement among NOB, ADI, and Timbalier/Durant had been for $225,000 to be directed to Timbalier and $75,000 to ADI, FDIC would be able to collect on Timbalier's $300,000 note pursuant to 12 U.S.C. § 1823(e). Section 1823(e) provides in relevant part:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

Timbalier and Durant do not assert, however, that a 75%–25% agreement had been made.

rant failed to notify the federal banking authority of a $75,000 defense to collection on a $300,000 promissory note until after the NOB failed and was placed in the hands of a receiver, NOB carried a $225,000 asset that appeared on its face to be a $300,000 asset.[9] Timbalier and Durant thus lent themselves to permitting the bank to carry inflated assets.

■ Timbalier and Durant cite *FDIC v. Meo*, supra, for the proposition that the failure–of–consideration defense may be raised against the FDIC. The defendant in *Meo* was the maker of a note and a borrower who had been completely unaware of wrongful activity on the part of the bank. The Ninth Circuit Court of Appeals concluded "that a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note is not estopped from asserting such defense against the bank's receiver." *Id.* at 793. *See also D'Oench*, supra, 315 U.S. at 474, 62 S.Ct. at 687. The holding in *Meo* is consistent with the holding in *D'Oench* as *D'Oench* only proscribes use of the failure–of–consideration defense when the maker of the note could have and in the circumstances should have taken action to prevent the bank's carrying inflated assets. In the case at bar, Timbalier and Durant, having become party to a deceptive scheme regarding the value of the note, lost the opportunity to raise their asserted defense against FDIC.

Timbalier and Durant also cite *FDIC v. Vineyard*, 346 F.Supp. 489 (N.D.Tex.1972) as a case wherein failure of consideration had been raised. While it is true that in *Vineyard* failure of consideration had been asserted as a defense to collection on one of the notes, there was no indication that the note in question was the subject of a scheme by which the bank's assets were overstated. Another note in the suit was

one to which the court did apply the *D'Oench* doctrine, and the *Vineyard*, court refused to entertain the failure–of–consideration defense for that note.

A third case upon which Timbalier and Durant rely in their attempt to establish that they may properly raise the defense of failure of consideration is *FDIC v. Vogel*, 437 F.Supp. 660 (E.D.Wis.1977). *Vogel* involved an action by FDIC to recover against guarantors of a letter of credit. Defendants in *Vogel* contended that adequate consideration had not been given for the guarantees. The court found that the defense failed as a matter of law pursuant to 12 U.S.C. § 1823(e). *Vogel*, therefore, does not stand as authority for permitting a defendant to raise failure of consideration as a defense.

The facts in the case at bar are analogous to the facts in *FDIC v. Motorlease, Inc.*, 56 Misc.2d 306, 288 N.Y.S.2d 356 (Sup.Ct.1967). The defendant, vice president of Motorlease, personally endorsed Motorlease's $25,000 promissory note and left it with another agent of the corporation for delivery to the lending bank. The bank loaned $11,000 to Motorlease on the basis of the note. Applying the rule in *D'Oench*, the New York court held the defendant to full liability on the note in spite of his assertion that there was failure of consideration. The court reasoned that the defendant's failure to take action against the bank or to timely inform state or federal banking authorities of the allegedly false status of the note "was an action which ratified and perpetuated the 'deception' or at the very least 'tended' to have such effect." *Id.*, 288 N.Y. S.2d at 358. Similarly, Durant endorsed Timbalier's $300,000 promissory note and left it with ADI's president, Dandy, for delivery to NOB. Although Timbalier received only $225,000, Durant did not take legal action against the bank, ADI, and

9. The letter to NOB more than seven months after the funds were disbursed indicates that Timbalier and Durant did not, on March 8, 1974, approve of the financial arrangement. The letter proves nothing about what kind of agreement was in effect at the time the funds were paid out. Furthermore, the letter shows no attempt to take legal action against the bank, ADI, and Alex Dandy or to notify authorities outside the bank of the true value of the note.

Alex Dandy, nor did Durant notify the banking authorities of his being short-changed. Timbalier and Durant therefore lent support to a design that tended to deceive the federal bank insurer.

The Court recognizes a possible distinction between *D'Oench* and its progeny and the instant case. In each opinion to which the Court has looked, the obligation upon which the obligor was sued had been made in favor of the bank. Here, the note was made in favor of ADI and transferred to the bank. The Court believes, however, that the factual variation does not take the present case out of the rationale for applying the *D'Oench* doctrine. Timbalier and Durant were not merely innocent third parties to a wrongful transfer of the Timbalier note. Rather, they participated in a three-way financial agreement in which they were directly and knowingly involved with NOB. That the note was made in favor of ADI instead of the bank is incidental to the substance of the transaction.

Another of Timbalier and Durant's affirmative defenses to FDIC's claim against them is an alleged commercial fraud on the part of ADI and/or Alex Dandy and/or NOB. Timbalier and Durant contend that the note came into existence in connection with a transaction in which Timbalier was to receive $300,000 from NOB. Timbalier and Durant further contend that they did not authorize NOB to transfer $75,000 of the note's face amount to ADI.

■■ Under the *D'Oench* equitable estoppel doctrine, the defense of fraud fails. Pursuant to the federal policy that FDIC ought to recover on its assets and thus may deny the application of certain affirmative defenses, the Court rejects Timbalier and Durant's fraud defense as a matter of law. Even if NOB's president, Richard W. Palmer, and Alex Dandy for ADI had combined to defraud Timbalier and Durant of a portion of the money that was to be directed to Timbalier, Durant's failure to report the alleged irregularities once he became aware of the lesser amount of money received by Timbalier made him a voluntary party to a scheme which tended to reduce NOB's assets. The $300,000 asset is worth less than face value if subject to a fraud defense. As stated in *British Columbia Investment Co. v. FDIC*, 420 F.Supp. 1217, 1224 (S.D.Cal. 1976) (citing *D'Oench*, supra, 315 U.S. at 460, 62 S.Ct. at 680), "[P]arties who voluntarily participate in fraudulent schemes likely to deceive bank examiners or creditors [are] estopped from asserting defenses based on representations or conduct of other participants in the fraud."

Timbalier and Durant argue that evidence of Palmer's conviction for certain crimes should be admitted under Rule 404(b), Federal Rules of Evidence. They further urge that FDIC's failure to call Palmer as a witness should militate against FDIC. Both of the above arguments concern evidentiary matters offered in support of Timbalier and Durant's fraud defense. As the affirmative defense of fraud fails as a matter of law, evidence of prior crimes and FDIC's failure to call a specific witness are irrelevant for Court discussion at this juncture.

The Court next addresses the affirmative defense of full payment of the obligation. Timbalier and Durant observe that $274,-158.37 was paid by or for Timbalier and that $14,820.00 was paid by ADI on the note in question. Timbalier and Durant conclude that $288,978.37 having been paid on the obligation, their liability for the $225,-000 principal plus interest has been met. The Court has determined, however, that Timbalier and Durant are obligated for full value of the $300,000 note plus $115,000 interest. As the obligation on the note has not been paid in full, Timbalier and Durant have not established the defense of payment.

### D. *FDIC's Claim Against ADI & Alex Dandy*

■ As admitted by ADI's counsel at trial, there is no question that ADI endorsed the $300,000 Timbalier note with full recourse in favor of the NOB, or that ADI has certain liabilities as an assignor and guarantor pursuant to an assignment of the note to NOB. On the bases of both the endorsement on the note and the assign-

ment of it to NOB, ADI is liable for the full amount due on the original $415,000 obligation.

Alex Dandy asserts that judgment should not be entered against him on his June 28, 1973 agreement to be bound as co–maker of all notes or other evidence of indebtedness and obligations of ADI to NOB. He asserts that FDIC took cognovit judgment against him in state court on the strength of his agreement to be bound, and judgment by this Court would subject him to double liability on the same document. He removed the aforementioned state court action to federal court. Civil Action No. C75-691. FDIC filed a second case against him in July, 1975, and he likewise removed that case to Federal Court. Civil Action No. C75–728.

On February 11, 1980, Civil Action Nos. C75–691 and C75–728 were settled and dismissed by stipulation, subject to final approval by the FDIC in Washington and to payment of an agreed sum of money by Alex Dandy.[10] FDIC eventually approved the settlement and on June 6, 1980, Alex Dandy paid the amount specified in the settlement agreement.

This Court holds Alex Dandy to his liability for obligations of ADI to the extent of his June 28, 1973 agreement to be bound. To avoid double liability on the basis of the document, the Court will order that FDIC is forbidden to recover more than once on the agreement. To the extent FDIC has relied on Alex Dandy's agreement to be bound and has recovered thereunder in Civil Action Nos. C75–691 and C75–728, FDIC will be barred pro rata from recovering against Alex Dandy in this action.

There is some question whether the $250,-000 agreement to be bound had been reduced by NOB to $184,500.[11] Counsel for plaintiff requested in opening statement that since the alleged reduction in the value of the agreement was an issue in Civil

Action No. C75–691, this Court not make any findings of fact on the agreement's value. Counsel for Alex Dandy agreed that evidence regarding the current face value of the agreement would not be presented in the case at bar. This Court therefore declines to address the value of Alex Dandy's agreement to be bound and holds only that he is liable on it, subject to prior recovery by the plaintiff.

### E. *FDIC's Claim Against Lilah Dandy*

FDIC attempts to recover on a document that is purportedly Lilah Dandy's agreement to be bound. FDIC acknowledges that the signature on the document is not Lilah Dandy's. By evidence presented to the Court, the plaintiff attempts to prove that Alex Dandy had authority to sign financial documents for his wife, Lilah, and that he signed her name to a November 30, 1972 agreement to be bound on all current and future obligations of ADI, Alex Dandy, and Corporate Development Systems, Inc., another corporation controlled by Alex Dandy.

■ Based on Lilah Dandy's deposition testimony read into the record at trial, the Court finds that Alex Dandy had authority to sign Lilah's name to documents. Lilah Dandy testified that her husband handled all their financial affairs. Although she could not recall her husband's having asked her if he could sign her name to specific papers, she would have granted permission if he had asked simply because he was her husband. Neither could she recall any occasion when he had signed her name to something and told her about it later. Plaintiff has not presented the court with any document that was admittedly signed by Alex Dandy for his wife. Lilah Dandy's testimony indicates, however, that Alex Dandy had authority to sign her name to financial matters even if the authority had never been exercised.

**10.** One condition of settlement was that FDIC seek to dismiss all pending claims against the Dandys. FDIC and the Dandys filed a joint motion to dismiss the Dandys as defendants in the present action. This Court denied the mo-

tion by an August 12, 1980 Order for the reason stated therein.

**11.** Various figures ranging from $184,000 to $185,000 were stated by the parties.

Two expert witnesses testified regarding the signature on the November 30, 1972 agreement to be bound. The witnesses agreed that the signature was a forgery of Lilah's signature. They also agreed that there were numerous shared characteristics between Alex Dandy's acknowledged handwriting and the forgery on the document in question.

The plaintiff's witness identified four NOB documents on which Lilah Dandy's signature had been forged. He identified signatures on three of the four documents as having been drawn signatures made by the same hand. The signature on the fourth document, an NOB transfer statement, was identified as definitely having been written by Alex Dandy. By examining characteristics of Alex Dandy's known handwriting and comparing them with characteristics found in the three questioned signatures, the plaintiff's witness concluded that it was "very probable" that all three signatures including the one on the November 30, 1972 agreement to be bound, were drawn by Alex Dandy.

The expert witness presented by Lilah Dandy was unable to reach a conclusion concerning the identity of the questioned signature's forger. The witness initially said that on the basis of his examination, which covered fewer documents than were available to the plaintiff's witness, there was a possibility that Alex Dandy had drawn his wife's name. Upon cross examination, the witness stated, "[T]he writing of Alex Dandy does have some characteristics that show up in a simulated forgery and I would draw a conclusion that he would certainly have the writing characteristics that would fit into this more than, say, the average man on the street might." Later, the witness agreed that in terms of what he considered a "probability," he would agree with the plaintiff's expert that there was a probability that Alex Dandy signed Lilah Dandy's name to the document.

Plaintiff has the burden of proving by a preponderance of the evidence that the signature in question was placed by Alex Dandy. *See e. g.* McCormick on Evidence §§ 337 & 339 (2d ed. 1972); 9 Wigmore, Evidence § 2486 (3d ed. 1940 & Supp. 1977). "Proof by a preponderance" is proof which leads the trier of fact to find that the existence of a contested fact is more probable than not. *See* McCormick, *supra* at § 339. Reviewing the exhibits offered during trial as well as the testimony of the two expert witnesses, the Court concludes that Alex Dandy more probably than not signed Lilah Dandy's name to the agreement to be bound.

■ The Court, having found that Alex Dandy had authority to sign Lilah Dandy's name on her behalf and having found by a preponderance of the evidence that Alex Dandy signed Lilah Dandy's name to a November 30, 1972 agreement to be bound, holds that Lilah Dandy is liable on the basis of the agreement. Under the agreement, she is liable for all then–current and then–future obligations of ADI and her husband. That there were no obligations outstanding on November 30, 1972 is inconsequential as the agreement covered current *and future* obligations.

### F. *Timbalier and ADI's Claims Against Each Other*

ADI cross–claims against Timbalier for Timbalier's primary liability on the note; Timbalier cross–claims against ADI for fraud and requests indemnification for any judgment that may be entered against Timbalier.[12]

■ By ADI's July 20, 1973 assignment of the Timbalier promissory note, ADI guaranteed payment of the note. If a guarantor "is obliged to pay all or any part of the common obligation to [the principal and guarantor's] creditor, he is entitled to full indemnity or exoneration and reimbursement from the principal or the party primarily liable for the debt." *Gholson v.*

12. Timbalier's original cross–claim against ADI contained a prayer for affirmative damages. At the close of trial, the Court granted a motion made by Timbalier to amend the prayer for relief to indemnification and attorney's fees.

*Savin,* 137 Ohio St. 551, 556, 31 N.E.2d 858, 861 (1941). ADI does not dispute that as guarantor and assignor it is obligated to pay the note. The Court therefore holds that upon full payment of the note, ADI is entitled to be indemnified by Timbalier

Timbalier's request for reimbursement from ADI is premised on charges that ADI's president, Alex Dandy, and NOB's president, Palmer, practiced a commercial fraud against Timbalier by misappropriating $75,000 allegedly due Timbalier.[13] As noted in the Court's findings of fact, the evidence offered by ADI and Timbalier is directly contradictory regarding the $300,000 disbursement of funds. Alex Dandy says that he informed Durant by telephone of the $75,000 holdback; Durant flatly denies that the conversation took place.

Furthermore, the testimony conflicts regarding the characterization of the loan. ADI maintains that it agreed to loan Timbalier the money for which Timbalier made ADI a promissory note, which ADI in turn used as collateral for its (ADI's) loan from NOB. ADI relies on the facts that 1) the note was made in favor of ADI, 2) the NOB loan application form lists ADI as having applied for the loan, and 3) NOB's July 19, 1973 minutes of the officers' meeting reflect a loan to ADI based on an ADI loan to Timbalier.

Timbalier, relying on a letter to the NOB president, urges that it, Timbalier, had procured a loan from NOB with the aid of ADI. The letter dated July 11, 1973–five days before the date on the promissory note and nine days before funds were disbursed– states in part, "Enclosed is the Promissory Note in favor of Associated Developers, Int. [sic] and other papers requested for this loan. . . . We would like to have the $300,000 transferred by bank wire to our account. . . ."

There is no way for the Court to reconcile the contradictory allegations of what trans- action(s) actually occurred or to determine the substance of the loan negotiations. The exhibits weigh in equipoise, and neither Alex Dandy nor Durant is a more credible witness than the other. The Court finds only that there was a three–way financial agreement among Durant for Timbalier, Alex Dandy for ADI, and Palmer for NOB. Neither Timbalier nor ADI has established by a preponderance of the evidence that the loan transaction was structured the way each suggests.

Assuming arguendo that Timbalier's version of the loan agreement–that Timbalier was to receive the full $300,000–accurately portrays the NOB/ADI/Timbalier transaction, the question remains whether Timbalier has waived the right to assert fraud against Palmer and Dandy. Despite knowledge of what Timbalier now asserts was fraud, i. e. that Palmer and Dandy combined to deprive Timbalier of $75,000, Timbalier acquiesced to the distribution of funds. During the more than seven months before Timbalier's March 8, 1974 letter to NOB and thereafter, Timbalier retained the benefits of monies acquired from NOB. Even after having received no response to the aforementioned letter, Timbalier was dilatory in taking action against ADI or NOB. The next communication by Timbalier regarding the disbursement was a letter to Alex Dandy more than a year later and after NOB had already gone into receivership. At no time did Timbalier bring legal action against Palmer and/or Dandy. The first time that Timbalier raised the issue of fraud was during the present litigation, which commenced more than five years after the funds were disbursed.

█ The Court concludes on the basis of the evidence before it that Timbalier knowingly accepted the funds under the alleged loan contract by the proportion in which they were disbursed. By failing to vigor-

---

**13.** Although Timbalier had raised a failure–of–consideration defense to FDIC's claim, Timbalier does not assert a similar defense against ADI.

The Court also notes that Timbalier had suggested to Alex Dandy that the disputed $75,-000 could be considered a loan from Timbalier to ADI. The Court, however, disregards the suggestion as Timbalier neither made the "loan" argument at trial nor briefed the issue.

ously and promptly challenge an allegedly fraudulent misappropriation of $75,000, Timbalier waived its right to assert fraud against ADI. As stated by an Ohio court in a case wherein the defendant cross–petitioned against the plaintiffs for false representations, "A duty rested upon the defendant to act promptly upon discovery of the fraud. He cannot remain silent, continue to experiment with the business, and a month later assert his right to declare the contract void." *Meyers v. Hoops*, Ohio App., 140 N.E.2d 65, 68, 74 Ohio L.Abs. 280, 284 (1955). *See also Koch Industries, Inc. v. Vosko*, 494 F.2d 713, 720–21 (10th Cir. 1974) (stock purchaser who waited six to seven months before raising objection to alleged fraudulent financial statement not able to recover for fraud); *duPont v. Perot*, 59 F.R.D. 404, 412–13 (S.D.N.Y.1973) (benefits retained with knowledge of fraud would preclude action for fraud); *Dean v. Yates*, 22 Ohio St. 388, 398 (1872) (ratification of contract voidable for fraud precludes action for fraud).

Timbalier's fraud claim against ADI fails as a matter of law. The Court need not decide, therefore, whether evidence of Palmer's convictions should be admissible pursuant to Rule 404(b), Federal Rules of Evidence. Accordingly, Timbalier's motion to reconsider the Court's ruling not to take judicial notice of Palmer's prior convictions is denied.

### G. *FDIC and ADI's Claims Against K. Bell*

FDIC as loss payee and ADI as an additional assured under an insurance policy bring negligence claims against K. Bell for injuries they suffered as a proximate result of K. Bell's breach of an alleged duty to them. They assert that they were harmed because K. Bell failed to notify them that they were being deleted from an insurance policy renewal.

To prevail on their negligence claims, FDIC and ADI must establish "a duty or obligation on the part of the person charged with such negligence to protect another from injury, a failure to discharge that duty, and an injury to such other prox-imately resulting from such failure." *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103, 108–09, 113 N.E.2d 629, 632 (1953). *See also, Daley v. Sears Roebuck & Co.*, 90 F.Supp. 561, 562 (N.D.Ohio 1949); *Railroad Co. v. Harvey*, 77 Ohio St. 235, 240, 83 N.E. 66, 68 (1907).

Plaintiff FDIC acknowledges that there is no statutorily derived duty on the part of an insurance broker to notify a mortgagee that it is being deleted from an insurance policy. Plaintiff attempts to establish that the duty of notification arises through the practice, custom, and usage in the international maritime industry. Plaintiff observes that "[a]n insurance contract or policy is to be construed with reference to the usages or customs of the mercantile world or of the trade or business with respect to which it was issued." Trial brief for plaintiff at 28, citing *Standard Oil Co. of New Jersey v. United States*, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (1950). The plaintiff further notes that usage may be an important factor in determining the duties of an agent employed to procure insurance. 3 Couch on Insurance, § 25:38 (2d ed. 1960). FDIC offers no authority, however, for its position that custom and usage establish a broker's duty to an entity not a party to the insurance contract.

The terms of an insurance policy ordinarily provide notice of the policy's termination to anyone with an interest in the policy's proceeds. K. Bell had informed FDIC by a May 29, 1975 letter that for the period "12 months at January 1, 1975, . . . the interest of the Northern Ohio Bank of Cleveland, Ohio is included as Loss Payee." FDIC was therefore on notice that its interest existed through December, 1975. Failure of an insurer to notify the insured of an insurance policy's expiration date, even when the agent had been in the custom or practice of discussing policy renewal, has not been held by the courts to impose liability on the insurer to remind the insured of policy expiration. *Marker v. Preferred Fire Insurance Co.*, 211 Kan. 427, 506 P.2d 1163, 1170 (1973); *Shepard v. United States Fidelity & Guaranty Co.*, 210 Kan. 652, 504

P.2d 228, 229 (1972); *Kapahua v. Hawaiian Insurance & Guaranty Co.*, 50 Haw. 644, 447 P.2d 669, 670 (1968); *Kimball v. Clinton County New Patrons Fire Relief Association*, 23 A.D.2d 519, 255 N.Y.S.2d 366, 368 (1965). Similarly, this Court will not impose a duty by a broker to notify one who is in a more remote position to the insurer than the primary insured.

There was no evidence to indicate that FDIC had received notice of coverage under the 1976 policy. FDIC nevertheless suggests that deletion from the policy without notice to FDIC results in continued coverage under *Wisconsin Barge Line, Inc. v. Coastal Marine Transport, Inc.*, 414 F.2d 872 (5th Cir. 1969). In *Wisconsin*, an additional assured, a tugboat owner, did not receive a cancellation notice for the policy covering the tug. The court of appeals, reversing the district court, held that the tugboat owner's insurance agent owed the owner a duty of notification upon cancellation of the policy. The court concluded that the failure to notify resulted in continued coverage for the owner.

*Wisconsin* is distinguished from the case at bar, however, in that the tugboat owner in the *Wisconsin* case was an additional assured, whereas the NOB was a loss payee.[14] As expressed by K. Bell's expert witness, an insurance broker, the rights of an additional assured are greater than the interests of a loss payee:

Q. Are you familiar with the designation, additional assured, as it exists in insurance?

A. Yes.

Q. An additional assured is a higher plane than a loss payee? In a sense, his rights are greater?

A. He gets some things that the loss payee does not get, because the additional assured would normally have a policy. He would have right of notice of termination, all of the rights that the assured would have as far as the procedure under a policy.

Q. Therefore, insofar as you are aware, the custom and practice of the industry certainly is the additional assured is entitled to a notice of termination if he is going to be terminated; isn't that correct?

A. If terminated midterm.

Q. If an owner, one named assured, says, "Get rid of Joe Doaks as an additional assured."

The custom and practice is to let Joe Doaks, the additional assured, know it is going to take place?

A. He would get a copy of the endorsement deleting.

THE COURT: Assuming it was during the term.

THE WITNESS: During the term.

Transcript at 717–18.

 FDIC fails to substantiate its assertion that a duty to a loss payee arises from trade custom and usage. The rights of an additional assured do not inure ipso facto to the benefit of a loss payee. Conversely, liability for failure to notify an additional assured of policy cancellation, assuming such liability exists, does not connote liability for failure to notify a loss payee.

 In addition to finding that the broker owes to the loss payee no duty arising from statute or custom and usage, the Court observes that the broker has no duty to the loss payee under the insurance contract. A broker hired to arrange insurance is the agent of the insured for purposes of making the application and procuring the policy. Couch, supra at §§ 25:92 and 25:98. The insured's agent owes to the insured the duty of obeying his instructions. *Creamery Insurance Co. v. Iowa National Mutual Insurance Co.*, 427 F.2d 504, 510 (8th Cir. 1970); Couch, supra at § 24:32. As neither FDIC nor NOB was the insured on a policy covering the Shawnee, there is no legal

---

14. One cannot assume, however, that this Court endorses the Fifth Circuit Court of Appeals' position that a duty of notice of cancellation is owed to an additional assured. The court in *Wisconsin* expounds no rationale for its holding that a duty of notification exists in favor of one other than the primary insured.

relationship by which a broker has a legal duty under the policy to protect FDIC and/or NOB's interests.

ADI as additional assured may have greater rights under an insurance policy than a loss payee has. *Wisconsin Barge Line, Inc. v. Coastal Marine Transport, Inc.*, supra; Transcript, supra. ADI may have been entitled, therefore, to notification in May, 1974 that it was being deleted during the term of the 1974 policy. Assuming, however, a duty by K. Bell to inform ADI of the deletion, any duty to ADI terminated at the expiration of the 1974 policy. *Marker v. Preferred Fire Insurance Co.*, supra; *Shepard v. United States Fidelity and Guaranty Co.*, supra; *Kapahua v. Hawaiian Insurance & Guaranty Co.*, supra; *Kimball v. Clinton County New Patrons Fire Relief Association*, supra.

The loss on the Shawnee occurred in 1976. If K. Bell had owed a duty to ADI, the duty terminated more than a year before the loss. It was ADI's obligation to apprise itself of the duration of its insurance interests. Damage suffered by ADI as a result of its not being listed as an additional assured on the Shawnee policy is a proximate result of ADI's negligence, not the result of negligence on the part of K. Bell.

### H. *Remedy*

The parties stipulated that the accounting records of FDIC and NOB establish the amount outstanding on the Timbalier note as of November 27, 1979 to be $134,247.97. In their post–trial brief, Timbalier and Durant state that the aforementioned figure reflects "that such amount is what FDIC claims according to its records, not that such figure is a legitimate figure or that FDIC's computations to arrive at such figure are valid and should be accepted by the Court."

The Sixth Circuit Court of Appeals observes the binding effect that stipulations have on the parties and the Court. *More-*

*lock v. N.C.R. Corporation*, 586 F.2d 1096, 1107 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). Under *Fairway Construction Co. v. Allstate*, 495 F.2d 1077 (6th Cir. 1974), "the general rule is that stipulations entered into freely and fairly are not to be set aside except to avoid manifest injustice."

Timbalier and Durant did not challenge the stipulated figure at trial, nor did they offer proof at trial for a figure other than the one to which they had stipulated. Other parties to the lawsuit had no opportunity to challenge Timbalier and Durant's calculations. Furthermore, the Court has proceeded with the understanding that the stipulation reflects the amount due on the note. The Court therefore declines to permit Timbalier and Durant's challenge to the $134,247.97 figure.

The note contains an acceleration clause providing that in case of default the owner of the note may declare on demand all sums owing on the note due and payable. A declaration by the owner of the note that payment is in default accelerates the date of maturity and triggers the accrual of interest at eight percent per annum. Eight percent simple interest thus has been accruing since July 16, 1978, the date that FDIC declared payment in default.

The final issue for consideration in the instant case is whether FDIC may recover attorney's fees from Timbalier, Durant, and ADI. FDIC suggests that its right to recover fees is governed by federal law and that the Court should fashion federal common law to permit the enforcement of an attorney's fees contract on commercial paper acquired by the FDIC.

■ There is no statutory provision in Chapter 16 (FDIC) of Title 12 (Banks and Banking) of the United States Code regarding the validity of attorney's fees clauses on promissory notes.[15] The Court therefore

---

15. The issue presently before the Court is not whether FDIC as a prevailing party should recover attorney's fees incurred in litigating the case against the defendants. Under *Alyeska Pipeline Service Co. v. Wilderness Society*, 421

U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), a prevailing party cannot recover attorney's fees for winning the lawsuit absent statutory authorization. Plaintiff in the case at bar does not assert a federal statutory grant of fees for

looks to congressional history to determine whether Congress intended that federal common law should apply to enforcement of certain contract provisions. *See D'Oench,* supra, 315 U.S. at 473–74, 62 S.Ct. at 686–687. Upon examination of the legislative history and purpose of 12 U.S.C. § 1819, wherein the FDIC is granted the power to sue and be sued, the Court finds no congressional intent that federal law must determine whether an attorney's–fee clause on the face of the note is enforceable. [1950] U.S.Code Cong. Service, p. 3765; [1966] U.S. Code Cong. and Admin.News, p. 3532.

Having found no intent that federal law applies to the issue of contracted fees, the Court need not reach the question of what the federal common law should be.[16] The Court therefore applies state law.

FDIC argues that if state law applies, the Court should look to the intent of the parties to determine under which state's law the parties contemplated enforcement of the note provisions. *D'Oench,* supra. Plaintiff argues that the note was signed in Louisiana, therefore Timbalier and ADI must have intended that Louisiana law apply.

■ This Court infers, however, that the parties tacitly understood Ohio law on attorney's fees to control. First, upon being signed and sent to Ohio, the note remained in Ohio at all times relevant to this lawsuit. Second, the note was, as intended, an asset of an Ohio bank. Third, persons who endorsed the note knew that its situs would be Ohio. Fourth, the last entity to lend money on the note was an Ohio lender.

*See Manufacturers Trading Corporation v. Roberts,* 138 F.2d 806, 808 (5th Cir. 1943) (Fifth Circuit Court of Appeals applying Ohio law where lender was an Ohio corporation). The Court finds that the foregoing reasons legitimately impel application of Ohio law to the enforceability of agreements to pay attorney's fees.

■ *Miller v. Kyle,* 85 Ohio St. 186, 97 N.E. 372 (1911) sets out the Ohio rule regarding the validity of stipulations in promissory notes for the payment of attorney's fees. The Ohio Supreme Court stated, "It is the settled law of this state that stipulations incorporated in promissory notes for the payment of attorney fees, if the principal and interest be not paid at maturity, are contrary to public policy and void." *Id.* (Syllabus 1).[17]

■ Ohio likewise prohibits the enforcement of express agreements for recovery of attorney's fees for breach of a simple contract. *Gates v. City of Toledo,* 57 Ohio St. 105, 48 N.E. 500 (1897) (Syllabus). See also *Motorists Mutual Insurance Co. v. Trainor,* 33 Ohio St.2d 41, 47, 294 N.E.2d 874 (1973). Language contained in ADI's assignment wherein ADI agrees to pay counsel fees is therefore invalid and unenforceable.

Accordingly, the Court hereby enters judgment for the plaintiff and jointly and severally against defendants Timbalier, Durant, ADI, and Alex and Lilah Dandy for the amount due on the promissory note in a total amount not to exceed $134,247.97 plus eight percent simple interest per annum from November 27, 1979. Further, the Court hereby forbids plaintiff from execu-

prevailing against the defendants. Rather, plaintiff seeks to enforce contract provisions in documents signed by the defendants for collection of attorney's fees connected with enforcement of a note upon default.

16. The Court is aware of the pre–*Erie v. Tompkins* diversity case wherein a federal district court declined to follow West Virginia's public policy against a provision in a promissory note for the payment of attorney's fees. The court in *Citizens National Bank of Orange v. Waugh,* 78 F.2d 324, 333 (4th Cir. 1935) looked to the "overwhelming weight of authority throughout the country" and applied "general commercial law" to permit the award of fees. The afore-

mentioned case might be said to provide the federal common law on the issue, but in view of the fact that it was a pre–*Erie* diversity case, this Court does not see it as persuasive authority. *Cf. United States v. Johnson,* 102 F.Supp. 818 (D.N.D.1952) (stipulation for attorney's fee on promissory note void and unenforceable under forum state's statute).

17. The syllabi provide the rules of the case in Ohio reported decisions. *Merrick v. Ditzler,* 91 Ohio St. 256, 264, 110 N.E. 493 (1915). *See also, Buddies Lunch System, Inc. v. Bowers,* 170 Ohio St. 410, 413, 165 N.E.2d 924 (1960).

ting recovery against Alex Dandy for liability in present and prior cases in an amount greater than the limitations contained in his agreement to be bound. Further, the Court hereby enters judgment for ADI and against Timbalier on ADI and Timbalier's cross-claims against each other. Further, the Court hereby enters judgment for defendant K. Bell and against the plaintiff. Further, the Court hereby enters judgment for K. Bell and against ADI. Further, the Court declines to award attorney's fees.

IT IS SO ORDERED.